# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHRISTA PIKE** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **LISA HELTON, Tennessee Interim Commissioner of Correction,** | ) | |
| | ) | |
| **LEE DOTSON, Tennessee Assistant Commissioner of Prisons,** | ) | **No. 3:22-cv-00537** |
| | ) | |
| **GLORIA FISHER, Warden, Debra K. Johnson Rehabilitation Center,** | ) | **District Judge Campbell** |
| | ) | **Magistrate Judge Newbern** |
| **TERRY BARLOW, Associate Warden of Security, Debra K. Johnson Rehabilitation Center,** | ) | |
| | ) | |
| **DAFFANY BAKER, Associate Warden of Treatment, Debra K. Johnson Rehabilitation Center,** | ) | **JURY DEMAND** |
| | ) | |
| **And** | ) | |
| | ) | |
| **CLIFFORD JONES, Unit Manager, Unit Three, Debra K. Johnson Rehabilitation Center,** | ) | |
| | ) | |
| **Each in their official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## AMENDED COMPLAINT

Plaintiff Christa Pike, by and through undersigned counsel, states as follows for her complaint:

## INTRODUCTION

1.      Plaintiff Christa Gail Pike ("Plaintiff" or "Ms. Pike") was sentenced to death on March 30, 1996, for a homicide that occurred when she was eighteen years old. While she experienced a brief period of regular work and social interaction for several months at the

beginning of her incarceration, her life since that time has been defined by the four concrete walls and bare floor of the cell that she is locked in for up to twenty-four hours each day. Defendants have subjected Ms. Pike, now forty-six, to solitary confinement with virtually no opportunity for meaningful human contact for more than twenty-five years.[1] She is fundamentally alone.

2. Because she is under a sentence of death, Tennessee Department of Correction ("TDOC") and Debra K. Johnson Rehabilitation Center ("DJRC") policies require that she be subject to mandatory segregation from other incarcerated individuals not under a sentence of death. Men under a sentence of death are also segregated from the general population within their facility, but have freedom of movement, can socialize with each other, hold jobs, and attend educational and religious programming together with the forty-five other men similarly incarcerated. As the only woman under a sentence of death in Tennessee, Defendants have subjected Ms. Pike to unending confinement alone in her cell for decades.

3. Defendants have subjected Ms. Pike to solitary confinement based on the arbitrary fact that she is the only woman sentenced to death in Tennessee.

4. For decades, Ms. Pike was confined to her cell, approximately a seven-by-twelve foot space with only a bed, shelves, sink, and commode, for twenty-two to twenty-four hours per day, every day. The conditions of her life are stark. While she was entitled to an hour of recreation each weekday, she spent that time in an empty concrete cage, and only when staffing and weather allowed. Ms. Pike has only been permitted to hold a job outside of her cell for brief periods

---

[1] Throughout the Complaint, Ms. Pike uses both the terms "mandatory segregation" and "solitary confinement." She understands that TDOC takes the position that she is housed under a "mandatory segregation" policy. In Ms. Pike's case, the conditions of mandatory segregation, which often require confinement in a single cell for between twenty-two and twenty-four hours per day, segregated from all other individuals incarcerated at DJRC who are not under a sentence of death, are nearly indistinguishable from what is colloquially known as solitary confinement, given that Ms. Pike is the only woman sentenced to death in Tennessee.

2

throughout her incarceration. Defendants generally confine her continually from Friday evening through Monday morning. She receives all meals in her cell. Defendants prohibited Ms. Pike from having contact visits with her family, attorneys, or spiritual advisors from at least 2019 until June 24, 2022, which means that she had not been allowed necessary legal and expert visits in pursuit of her clemency petition until after engaging undersigned counsel. Defendants imposed these restrictive conditions without rational justification and without meaningful process.

5.     Ms. Pike suffers from underlying psychological disabilities and cognitive impairment, rendering her particularly vulnerable to the established physical and psychological effects of prolonged segregation in solitary confinement.  The cumulative effect of this extreme punishment, and a corresponding deprivation of adequate psychological and medical care while under a sentence of death, has deprived Ms. Pike of basic constitutional guarantees of humane treatment.

6.     Defendants' ongoing confinement of Ms. Pike has physically and psychologically injured her. She has had substantial declines in her overall physical health, including vision impairment and deterioration, weight-gain, and decreased overall mobility. She has developed new psychological disorders, including obsessive compulsive disorder, and her pre-existing psychological and physical conditions have worsened. She has struggled continuously with thoughts of suicide and self-harm due to the hopeless and stark nature of her life.

7.     Defendants have previously issued both facility level and individual exceptions to the mandatory segregation policies for women under a sentence of death. These exceptions remain available options for Defendants. However, Defendants have made clear that they will refuse to meaningfully consider any relaxation of the restrictive and arbitrary conditions currently applied to Ms. Pike, despite their full knowledge of the ongoing and compounding harm they cause.

3

8.     Defendants have known of the risks and harm of solitary confinement for decades. TDOC and DJRC have been the subject of numerous lawsuits regarding their improper use of solitary confinement where experts have repeatedly disclosed the acute harm of this practice. Ms. Pike's own experts have issued reports that detail how her particular vulnerabilities compound the effects of solitary confinement. In other words, Defendants have been continually informed of the substantial risk of physical and psychological harm caused by committing Ms. Pike to permanent solitary confinement, and they have acted with deliberate indifference to that risk. Defendants have caused Ms. Pike to suffer immense physical and psychological harm in violation of the Eighth Amendment.

9.     Defendants have also violated Ms. Pike's rights guaranteed by the Fourteenth Amendment's Due Process Clause by indefinitely placing Ms. Pike in solitary confinement. Although Ms. Pike is technically subject to both security classification and unit panel reviews in connection with the level system applied to individuals sentenced to death, these reviews are meaningless. For decades, Defendants have used "overrides" of security classifications due to her sentence of death, meaning that Ms. Pike's behavior or lack of disciplinary actions could never change her security classification. Likewise, although Ms. Pike was advanced to the least restrictive privilege level for individuals sentenced to death on June 21, 2022, any new "privileges" she may be granted still do not afford her meaningful interaction with other human beings, and so long as she is sentenced to death and subject to current TDOC policies, that will not change.

10.     In addition, Defendants have violated the Equal Protection Clause of the Fourteenth Amendment by treating her substantially harsher than similarly situated men sentenced to death in Tennessee. The vast majority of men sentenced to death are either not placed in solitary confinement or are subject to solitary confinement for limited periods of time for more flagrant

4

and recent disciplinary violations than those Ms. Pike has committed. Moreover, men sentenced to death in Tennessee are not automatically placed in indefinite, solitary administrative segregation as a result of their death sentences.

11.     Defendants have also failed to adequately provide for and make accommodations for Ms. Pike's known medical needs. Solitary confinement has significantly and irreparably damaged Ms. Pike's physical and mental health. Despite this, Defendants have failed to provide needed care and alleviation from the conditions causing or exacerbating her health conditions.

12.     Since her level change, minimal changes have been made to Ms. Pike's living conditions. These changes have allowed for marginally more time out of her cell, but continue to deprive her of meaningful human contact, appropriate and confidential legal counsel, and any measure of freedom of movement.

13.     Through this action, Ms. Pike seeks a declaration that the Defendants' conduct violates 42 U.S.C. § 1983, the First, Eighth, and Fourteenth Amendments to the United States Constitution, 18 U.S.C. § 3599, the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1, *et seq*, Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*, and the Rehabilitation Act, 29 U.S.C. § 794, *et seq*.  Ms. Pike seeks injunctive relief as fashioned by this Court sufficient to address Ms. Pike's psychological and medical needs and to provide her a path for relief from her prolonged and indefinite solitary confinement. She also seeks confidential mental health counseling and treatment, and other appropriate medical care, to redress the deleterious psychological and physical effects of her long-term isolation in solitary confinement.  The relief Ms. Pike seeks is structural in nature and involves changes to the policies and procedures set and controlled by Defendants.

14.     Ms. Pike now brings an action for declaratory and injunctive relief under 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, which authorizes federal courts to decide cases arising under the Constitution, laws, or treaties of the United States; 28 U.S.C. § 1343(a), which authorizes federal courts to hear civil cases brought under 42 U.S.C. § 1983; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because all defendants are residents of the State of Tennessee, and at least one defendant resides in the Middle District of Tennessee.  A substantial part of the events or omissions giving rise to the claims brought by Ms. Pike has occurred in this district.

## PARTIES

17.     Plaintiff Christa Gail Pike is forty-six years old.  She is currently the only woman sentenced to death in Tennessee.  She was convicted of first degree murder and sentenced to death in 1996 for a crime committed when she was eighteen years old.  Ms. Pike has exhausted her post-conviction appeals, and the State has requested a date for her execution, which she has opposed. She has also requested a Certificate of Commutation. The opposition and commutation request are both pending review.  She has been confined in jail awaiting trial or in prison for over twenty-seven years and has spent more than a quarter century—more than half of her entire life—in mandatory segregation.

18.     Defendant Lisa Helton is the Interim Commissioner of TDOC.  She provides the final approval of rules applicable to individuals sentenced to death, is responsible for TDOC's policies and procedures, and provides final approval for funding necessary to provide resources to

6

prisons, prison personnel, and ultimately to prisoners. As the Interim Commissioner, Defendant Helton has the authority to make changes in Ms. Pike's restrictions and living conditions or to provide final approval for any policy exceptions. Ms. Helton is the only Defendant with the authority to provide all of the systemic changes and resources Ms. Pike seeks in this case. She is sued in her official capacity.

19.     Defendant Lee Dotson is the TDOC Assistant Commissioner of Prisons. He is responsible for overseeing the operations of the TDOC institutions. He has the authority to approve certain facility-level policies and procedures developed the DJRC Warden that relate to Ms. Pike's living conditions and to make changes to Ms. Pike's living conditions. He is sued in his official capacity.

20.     Defendant Gloria Fisher is the Warden of DJRC. She is in charge of implementing rules and procedures for all individuals incarcerated at that facility, including those under a sentence of death. She has the authority to make changes to Ms. Pike's living conditions, policies and procedures applicable to Ms. Pike, privileges afforded under the program level system for individuals sentenced to death at DJRC, and health care services provided at the facility. She is sued in her official capacity.

21.     Defendant Terry Barlow is the Associate Warden for Security at DJRC. He is also responsible for implementing rules, procedures, and privileges for all individuals incarcerated at that facility, including those under a sentence of death. He has the authority to make changes to Ms. Pike's living conditions, security classification, and other security operations as it relates to Ms. Pike. He is sued in his official capacity.

22.     Defendant Daffany Baker is the Associate Warden for Treatment at DJRC. She is also responsible for implementing rules, procedures, and privileges for all individuals incarcerated

7

at that facility, including those under a sentence of death. She has authority to make changes to Ms. Pike's living conditions and medical treatment, and she oversees the operation of the grievance policies. She is sued in her official capacity.

23.     Defendant Clifford Jones is the Unit Manager for Unit Three at DJRC, where Ms. Pike resides.  He also has responsibility for implementing rules, procedures, and privileges for individuals within the Unit, including those under a sentence of death.  He has authority to review, approve, and/or make and changes Ms. Pike's living conditions, including on the availability and assignment of a job, frequency of mail delivery, and conditions of recreation.  He is sued in his official capacity.

## FACTUAL ALLEGATIONS

### A.     *Background and Procedural History*

24.     Ms. Pike was sentenced to death on March 30, 1996, in Knox County. She was received by the Tennessee Prison for Women (now DJRC) on April 2, 1996, just a few weeks after her twentieth birthday.

25.     Defendants have held Ms. Pike in mandatory segregation continuously after arrival at DJRC. TDOC defines mandatory segregation, as described more fully below, as "[a]ssignment to maximum security housing of those inmates committed to the Department under the sentence of death." (TDOC Policy 404.11(IV)(A).)[2] Individuals sentenced to death, such as Ms. Pike, are to be "single-celled and housed in a Maximum Security Administrative Segregation (MSAS) unit separate from the general population." (TDOC Policy 506.14(VI)(B)(2).)[3]

---

[2] *Available at* https://www.tn.gov/content/dam/tn/correction/documents/404-11.pdf (last accessed July 11, 2022.)
[3] *Available at* https://www.tn.gov/content/dam/tn/correction/documents/506-14.pdf (last accessed July 11, 2022.)

8

26.     Ms. Pike was reviewed upon arrival for her relative risk and security classification. Her April 1996 Offender Classification Summary reflected that although she scored in the range for "Medium" custody on her classification assessment form ("CAF"), she would be placed in Maximum custody, in segregation from other individuals, as indicated by the notation "Override Type: MSGR" on the summary in accordance with TDOC and facility policy. The "MSGR" mandatory segregation override was due to her sentence of death.

27.     For the majority of her incarceration, Ms. Pike has been housed in Unit Three at DJRC in Nashville, Tennessee. Unit Three opened in or around 2001 and is the maximum custody unit at DJRC. Among other maximum custody individuals, Unit Three houses all women sentenced to death, which at this time is only Ms. Pike, as it has been for years.

28.     Ms. Pike resides in B Pod within Unit Three. In addition to serving as DJRC's makeshift "death row," Defendants use B Pod to house women suffering from extreme mental illness or in the midst of serious mental health crises, women being held in solitary confinement as "safekeepers,"[4] and women whom the prison is punishing for behavioral problems. No matter Ms. Pike's good behavior, she is housed with a revolving door of many of the prison's most difficult residents in a loud, chaotic, and constantly changing environment with constant, disruptive stimuli.

29.     Ms. Pike has been in mandatory segregation for at least twenty-five years, with no meaningful opportunity to mitigate the effects of such segregation.

30.     Ms. Pike had a brief period of time when she was allowed limited engagement with others while still housed in segregation. In May 1997, she was approved by the Associate Warden

---

[4] "Safekeepers" are defendants whom a court has ordered into TDOC custody while awaiting adjudication and/or sentencing when the local jail is insufficient for housing the individual for some reason, often due to medical problems, mental illness, or behavioral issues.

9

of Operations and facility Warden to have "gradual release into population" from segregation, be assigned a job as a teacher's aide, receive continued mental health counseling, and have a security escort to and from all programs.

31.     These sparse freedoms were short-lived. In or around October 1997, Ms. Pike was terminated from her job as a teacher's aide following a contested disciplinary infraction that occurred while she was working. She never received "gradual release" from her segregation, as recommended by her treatment plan, and so has lived continuously in mandatory segregation since approximately April 1996.

32.     Since that time, Ms. Pike has had two other significant infractions while incarcerated, one ten and the other over twenty years ago.

33.     In 2004, Ms. Pike was convicted in Davidson County Criminal Court of attempted first degree murder after an altercation in 2001 with another incarcerated individual.  In 2012, Ms. Pike was disciplined for attempting to escape.  Ms. Pike denies any involvement in the alleged escape, and the evidence at issue in the disciplinary action never identified that she had any knowledge of the alleged "escape plan" that was initiated by an outside third party.

34.     Although Ms. Pike had multiple disciplinary infractions during her first ten to fifteen years of imprisonment, her disciplinary infractions from the past ten years have been infrequent and relatively minor.  Despite this, Ms. Pike has had no opportunity for meaningful social interaction or to leave her cell without restraint.

35.     As described further below, Ms. Pike's living conditions leave her with virtually no physical or social contact with others and have resulted in extreme harm to her physical and mental health.

10

36.     Defendants' various policies, procedures, and localized decisions operate together to keep Ms. Pike in solitary confinement and deprive her of her rights.

**B.     *Relevant Policies and Procedures***

37.     Multiple TDOC policies, in combination with Defendants' facility-level and individualized decisions, create the framework governing Ms. Pike's conditions of incarceration.

38.     First, TDOC's Mandatory Segregation Policy requires that individuals "who are sentenced to death shall be assigned to mandatory segregation . . . ." (TDOC Policy 404.11(V).) By policy, these individuals are automatically designated as "maximum custody" for their security classification (*Id.* at (VI)(A)(2).) This admonition is repeated in TDOC's Housing Assignment Policy, which mandates, "Inmates who are under a sentence of death shall be single-celled and housed in a Maximum Security Administrative Segregation (MSAS) unit separate from the general population." (TDOC Policy 506.14(VI)(B)(2).)

39.     Because Ms. Pike is the only woman sentenced to death in Tennessee and is required to be segregated from any individuals in the general population of the prison under the Mandatory Segregation and Housing Assignments Policies, she has effectively been subjected to solitary confinement without any real opportunity to be released from it.

40.     Pursuant to the Mandatory Segregation Policy, DJRC is required to "review[ ]" Ms. Pike every thirty days. (TDOC Policy 404.11(VI)(B).) During these reviews, Ms. Pike often raises questions and concerns about her privileges, Program Level, and conditions of confinement. When they are performed, DJRC staff generally does so in a perfunctory manner at Ms. Pike's door. Defendants Fisher, Baker, Barlow, and Jones have all participated in or signed off on Ms. Pike's thirty-day reviews.

11

41.     Second, all individuals sentenced to death in Tennessee are also subject to the "Program Levels" system of review within the segregated unit. (TDOC Policy 503.03, hereinafter "Program Levels," "Level System" or the "Program Levels Policy.")[5]

42.     TDOC implemented the Program Levels classification system in the wake of challenges to the constitutionality of conditions of confinement and prison conditions in Tennessee. *See Groseclose v. Dutton*, 609 F. Supp. 1432 (M.D. Tenn. 1985). The *Groseclose* lawsuit was initiated by men then sentenced to death in Tennessee regarding the conditions of their confinement, which included mandatory segregation in individual cells; mandatory security classification based solely on their sentence; a single hour of recreation time in a yard that included weights, a bench, and punching bag; and limited psychological and psychiatric assistance. *Id.* at 1435–38. As a result of that lawsuit, TDOC agreed to implement the Level System that allowed more meaningful classification for men under a sentence of death and opportunities for the group to have time for social interaction, mental health counseling, educational programming, and group religious activities. Although prison infrastructure has improved since the 1980s, many of the conditions of solitary confinement about which men complained remain in effect as to Ms. Pike due to her status as the only woman sentenced to death in Tennessee.

43.     Under the current Program Levels Policy, individuals sentenced to death are subject to regular review by the Unit Review Panel and can reach different classification "levels" which entitle them to greater privileges within the segregated unit for individuals sentenced to death. All such individuals start at Level C, which is the most severe and restrictive form of incarceration.

---

[5] Citations herein to Policy 503.03 refer to the version signed by Defendant Helton and effective February 1, 2022. Policy 503.03 was recently revised as the result of a settlement in similar litigation. A copy of Policy 503.03 as revised is filed at Docket Entry 123-1 in the matter styled *Hall v. Trump*, No. 3:19-cv-00628 (M.D. Tenn.).

Discretionary privileges, like access to group meals, board games, movement in and out of their cells, participation in programming, and contact visits increase with each level up to Level A.

44.     TDOC policy is clear, however, that these privileges only apply *within* the restricted unit.  In other words, the Program Levels Policy continues to maintain the Mandatory Segregation Policy and pre-supposes that no individuals under a sentence of death will congregate in any meaningful way with individuals *not* under a sentence of death.

45.     At the nearby Riverbend Maximum Security Institution ("Riverbend"), this means that men housed in Unit Two under a sentence of death are still able to congregate and socialize with each other, subject to the privileges allowed by their Program Levels. For instance, Level A individuals are able to spend time with one another, take their meals together, hold a variety of jobs, participate in religious, educational, and social programming, and generally move freely among each other within Unit Two.

46.     According to the Program Levels Policy, Defendant Fisher, as Warden, is responsible for appointing the Unit Review Panel, which evaluates Ms. Pike for her Program Level assignment, and Defendant Jones, as Unit Manager, or in the alternative the Chief Counselor, is to serve as the Chairperson of the Unit Review Panel. (*Id.* 503.03(VI)(B).) All Program Level assignments recommended by the Unit Review Panel are subject to the approval of Defendant Jones and Defendant Barlow. (*Id.* 503.03(VI)(J).) Further, any elevation from Level C to a less restrictive Program Level requires Defendant Fisher's approval. (*Id.* 503.03(VI)(J)(3).) At all Program Levels, certain freedoms are available at Defendant Fisher's, Defendant Jones's, or Defendant Barlow's discretion. (*See id.* 503.03(VI)(K).)

13

47. Defendant Fisher is responsible for developing local policies and procedures to administer the Program Levels Policy. (*Id.* 503.03(VI)(P).) And, Defendant Helton can grant exceptions to the Program Levels Policy. (*Id.* 503.03(VI)(O).)

48. For some number of years while Ms. Pike has been incarcerated (until approximately 2001 or 2002), DJRC maintained a separate policy that allowed for the security reclassification of females under a sentence of death, exempting them from the TDOC Mandatory Segregation Policy and ultimately allowing for their integration into the general population. (Tennessee Prison for Women ("TPW") Policy 503.00-01, Classification/Reclassification of Female Offenders Under Sentence of Death, Effective March 1, 1999.) This policy was approved by former DJRC Warden Earline Guida and the then-Assistant Commissioner of Operations and is attached as **Exhibit A**.

49. DJRC has also sought at least one individual exception to the TDOC Mandatory Segregation Policy for Gaile Owens, a woman who was formerly sentenced to death, but who was allowed to live in the general population and have free movement within her designated Unit. This exception was requested by then-Warden Cherry Lindamood and granted by then-TDOC Commissioner Donal Campbell. Ms. Owens has been the only other woman sentenced to death during Ms. Pike's incarceration.

50. Upon information and belief, Defendants have never sought, offered, or granted such an individualized exception to the Mandatory Segregation Policy for Ms. Pike since the security classification exemption promulgated through TPW Policy 503.00-01 was terminated in or around 2001 or 2002.

14

### C.     *Ms. Pike's Custody Classification and Program Level Assignment*

51.     Because Ms. Pike is the only individual sentenced to death and subject to the Mandatory Segregation Policy and Level System at DJRC, she has no ability to socialize with other similarly classified individuals and is consigned to indefinite solitary confinement. In contrast to the men at Riverbend who are all segregated from the general population together, Ms. Pike has no one else with whom she can interact under these policies and is prevented from joining other incarcerated individuals for vocational, recreational, educational, or behavioral programming or group religious services, even if she were granted the maximum privileges available under Level A.

52.     In Ms. Pike's case, for the last twenty-five years, the custody classification system and Program Level review procedures have been, and continue to be, meaningless. Despite consistently meeting the CAF rubric for a lower custody classification, Ms. Pike's recommended classification is repeatedly overridden because of her death sentence. Under the current TDOC Policy 404.11, she will always be classified as "mandatory segregation," no matter what she scores on the rubric used to assess custody levels. An example Classification Custody Assessment Form and Offender Classification Summary signed by former Warden Jewel Steele are attached as **Exhibits B and C**, respectively.

53.     Defendants continue to review Ms. Pike's custody classification in or around October of each year and continue to rely on her sentence to override her CAF score pursuant to the Mandatory Segregation Policy.

54.     In addition, Defendants have made clear that they will not provide her relief from solitary confinement or even the privileges that she is entitled to under the Level System.  Unit Review Panel hearings to determine Ms. Pike's Program Level do not take her behavior into

15

account, do not provide meaningful responses on what she might be able to do to obtain a higher level, and do not take into account the behavioral and psychological impacts of her isolation on her performance. She was repeatedly denied advancement to a higher Level, with no stated reason. Moreover, she has often been denied privileges that should be afforded to her under her Level classification at the direction of Warden Fisher with no meaningful explanation. For example, Defendants, and Defendant Fisher in particular, denied Ms. Pike all contact visits, even with spiritual advisors and legal counsel, despite her being eligible for these privileges. Although Ms. Pike's disciplinary record during her first ten to fifteen years of imprisonment shows frequent infractions, disciplinary infractions from the past 10 years have been rare and relatively minor, and she has had no disciplinary infractions since June of 2020. Despite this, Pike has had no opportunity for meaningful social interaction or to leave her cell without restraint or escort.

55. Indeed, Defendant Fisher has stated in front of others that she will not release Ms. Pike from solitary "until they come to kill her."

56. Ms. Pike's December 22, 2021 Unit Review Panel Hearing summary is attached as **Exhibit D**. Upon information and belief, her December 2021 Program Level assignment was approved by Defendants Fisher and Jones.[6]

57. Ms. Pike was moved from Level B to Level A as of June 21, 2022. In making the change to Level A, Defendants actually implemented a number of *additional* restrictions on both her movement and interactions with others. Defendants constructed a labyrinth of red and blue tape throughout the Pod indicating where she is allowed to move only with an escort (blue) and where she is not allowed to move at all (red). She was instructed that if she steps on the red tape

---

[6] Ms. Pike received this document from TDOC in redacted form. However, the form plainly requires approval by the Warden and Unit Manager, and it appears that the required signatures are present though redacted for unknown reasons.

16

that she will be "thrown back" to a lower Level immediately. Instead of being accompanied by two guards as before, Ms. Pike must now be accompanied by a guard *as well as* the Unit Manager or another supervisor for all activities. In many ways, the restrictions on Ms. Pike's movement are now more severe and appear constructed in order to trap her into technical failure.

58.     Ms. Pike continues to be denied the privileges afforded to men with a Level A classification – namely any meaningful social contact and confidential medical care and legal assistance.  Contact visits are contact visits in name only and both guards and Unit Manager Jones monitor within earshot what should be confidential legal visits. Ms. Pike's Program Level is currently classified at Level A, but her conditions of confinement and privileges, discussed in more detail below, are nearly indistinguishable from Level B and C.

59.     Fundamentally, additional "privileges" under the Program Level System are meaningless where the Mandatory Segregation Policy requires Ms. Pike's complete isolation from any other individuals, and privileges she has earned are routinely denied without reason by Defendants.

### D.     Ms. Pike's Conditions of Confinement

60.     For more than 25 years, Ms. Pike was forced to live in extreme isolation for twenty-two to twenty-four hours each day.  Her only opportunities to leave her cell were to shower three times each week, for one hour of recreation each weekday, to see medical providers, non-contact legal visits as needed, for her recently-assigned cleaning job, and to see her parents in non-contact visits approximately twice each month.

61.      Her cell is approximately seven feet wide by twelve feet long. It is constructed of cinder-block walls and a bare concrete floor. She has a single window above her bed that has a pole running through the middle. Her only furniture is her single bed, two shelves to hold her

17

limited possessions, a toilet, and a sink. Other cells in B Pod have a desk and chair, but she has not been allowed to have them.

62.     Her door is made of steel with a small window that is required to stay open and is covered with plate glass. Ms. Pike is able to speak through the door of her cell, but she has no individuals living in the cells next to hers. The glass over her door muffles the sounds of the Pod generally, so she is not able to speak to others in her Pod clearly from her cell. While this slightly reduces the constant and chaotic noise of the pod, it has also significantly dimmed her senses— intensifying her sense of isolation and exacerbating heightened sensitivity to noise.

63.     The Unit is constantly lit, so Ms. Pike must sleep with light streaming in her window each and every night.

64.     Ms. Pike's environment is chaotic, loud, disruptive, and has severe negative effects of Ms. Pike's wellbeing. The individuals that are in B Pod with Ms. Pike are women that the prison has punitively, administratively, or protectively sanctioned or confined. This includes individuals who suffer from extreme mental illness or are in the midst of mental health crises, individuals who are at severe risk of suicide, individuals who cannot be safely detained with the general population, individuals being held as "safekeepers," and individuals who the prison is punishing for behavioral problems. Generally, these individuals are incarcerated with Ms. Pike for only several weeks at a time, though some stay for several years. None has been in mandatory or punitive segregation for anywhere near as long as Ms. Pike. She has little, if any, opportunity to establish long-term or meaningful relationships.

65.     Ms. Pike is served three meals per day on weekdays and two meals on weekends— all of which are taken in her cell. She can access the Commissary once a week, and the items are brought to her to select.

18

66. Her opportunities for mental stimulation are minimal. She possesses a television, a small handheld radio, and sometimes reading materials to pass the time. Although she is able to have small arts and crafts, prison officials will frequently refuse her requests for supplies, sometimes for years on end, or confiscate them.

67. Ms. Pike's recreation time provides no actual opportunity for meaningful exercise or socialization. For twenty-five years, Ms. Pike was offered only one hour for recreation Monday through Friday, if weather and staffing allowed.[7]

68. Her recreation time takes place in a "recreation cage," which is empty and has a concrete floor. When Ms. Pike is in her recreation cage, no other incarcerated individuals are permitted to have recreation time in adjacent cages. There are no weights or equipment for her to use. She can see patches of grass from the cage, but cannot touch it.

69. Ms. Pike has no social contact with others. Defendants do not permit Ms. Pike to join any other incarcerated individuals for vocational, recreational, educational, or behavioral programming or group religious services.

70. Although individuals classified at Level B or A under the Program Level System for individuals sentenced to death are generally allowed to hold a job, Defendants denied Ms. Pike's requests for a job for years. After commencement of the undersigned's representation of Ms. Pike, she recently began receiving some work assignments cleaning B Pod. Defendant Jones has expressed reluctance to allow Ms. Pike to perform a job. As described more fully below, her ability to perform her job has recently been materially limited by arbitrary new protocols placed on her.

---

[7] Pursuant to TDOC Policy 503.03 effective February 1, 2022 as the result of a settlement in another recent, similar lawsuit, Ms. Pike is now entitled to exercise for a minimum of two hours per day. (TDOC Policy 503.03(VI)(K).)

71.     Ms. Pike's job consists of cleaning B Pod. Ms. Pike's ability to conduct her work assignments depends upon staffing, as Warden Fisher requires that she must be accompanied by a guard and the Unit Manager or another supervisor during her work. Thus, if these two individuals are unavailable to monitor Ms. Pike, she is unable to work. Her work time per day is strictly limited, and no other individuals in Ms. Pike's Pod within Unit Three can be outside of their cells during this time.

72.     Ms. Pike's movement around the Pod is severely limited. She must be accompanied at all times, is subject to shackling and handcuffing procedures, and is now barred from movement in and around her Pod by the labyrinth of tape. Areas of the Pod that Ms. Pike previously had been cleaning are now in restricted areas that she is not permitted to access.

73.     Since being assigned to Level A, Defendants have scheduled Ms. Pike's first work shift of the day such that she often misses lunch service. In other words, in exchange for the opportunity to work, Ms. Pike is forced to give up her opportunity to eat.

74.     Ms. Pike is severely stigmatized for her sentence of death. The prison has fashioned a sign that hangs at door that reads "Death Row." Defendant Helton has maintained policies that segregate Ms. Pike solely on the basis of her sentence. Defendants Fisher, Barlow, and Jones have adopted and maintained a "policy" that applies only to Ms. Pike, requiring that she have two guards assigned to her at all times when the flap in her door is opened, including to deliver the phone, or when she leaves her cell for any reason. Other individuals incarcerated in her Pod target her for her sentence of death, with one individual making repeated buzzing noises, mimicking the electric chair, as she passed by Ms. Pike's cell for years.

75. Despite this, Ms. Pike frequently advocates for the individuals incarcerated around her, particularly where they are older or in need of medical assistance. Ms. Pike will lobby guards, medical staff, or prison leadership to get ailing individuals the medical attention that they need.

76. Ms. Pike's connection with the outside world is highly controlled and limited. Ms. Pike's requests for daily phone calls have been denied. In spring of 2022, Defendant Fisher initiated a policy limiting all individuals in B Pod to two phone calls per month. Two guards must be stationed outside her cell when she is using the phone, making calls logistically difficult and lacking in privacy.

77. Defendants have also denied contact visits with family, legal counsel, and spiritual advisors since 2019. Ms. Pike has only been allowed "non-contact" visits. These visits occur in a locked and separated concrete cell, where visitors are on one side and Ms. Pike is confined on the other. She is separated from her visitors with a plate-glass window and must speak loudly to be heard through small holes in the steel encasement. Although the Defendant Barlow can approve contact visits for individuals assigned to Level A and B under TDOC Policy 503.03, (*see* TDOC Policy 503.03(VI)(K)(2)(b), (VI)(K)(3)(c)) Defendants, and in particular Defendant Fisher, have denied such requests without explanation.

78. Since her move to Level A in June 2022, Defendants have allowed Ms. Pike to have "contact" visits with legal counsel and immediate family. These are "contact" visits in name only. Ms. Pike is required to stay within a two foot by two foot box on the floor, demarcated in blue tape, and visitors are required to stay at least six feet away. Two guards are required to be in the room for family visits and immediately outside the door for legal visits. The room where contact visits have been conducted since her move to Level A also contains a video camera. Ms. Pike is

21

not permitted to hand documents directly to legal counsel and vice-versa; instead, Defendant Jones examines documents passed between Ms. Pike and legal counsel.

79.     Ms. Pike has access to a spiritual advisor, but even this lifeline has been limited. Visits with her spiritual advisors have been regularly scheduled contact visits in the past, but these visits were moved to non-contact visits with no explanation.

80.     Defendants have also denied contact visits with counsel. Previously, Ms. Pike was allowed to have contact visits with her counsel as needed. This would allow counsel to review papers with Ms. Pike, receive copies of documents relevant to her case, to work collaboratively on drafting or editing materials, or have her sign documents.

81.     These visits with counsel are necessary to numerous ongoing legal matters. In particular, Ms. Pike has opposed Tennessee's request to set an execution date and is pursuing clemency proceedings, for which she has engaged and wishes to have a contact visit with a psychological expert.

82.     In 2021 alone, Defendants denied multiple contact legal visits with Ms. Pike. For example, although post-conviction counsel had been approved on May 22, 2021 for a contact legal visit, counsel was not allowed to visit Ms. Pike except through the glass on arrival the following week. Ms. Pike's post-conviction counsel were allowed only to have non-contact legal visits on June 11, 2021, June 18, 2021, July 2, 2021, July 23, 2021, and August 2, 2021.

83.     On July 28, 2021, Ms. Pike's post-conviction legal counsel requested visits for himself and Ms. Pike's spiritual advisor. Citing her recent elevation to Level B, he requested these be contact visits. Ms. Chantal Falavel denied Ms. Pike's counsel's request for contact legal and spiritual visits, instead approving non-contact visits "per Warden's office."

84.     Another of Ms. Pike's attorneys forwarded the July 28, 2021 denial to Kelly Young, TDOC Inspector General, seeking the Office of General Counsel's help to protect Ms. Pike's rights. Ms. Young responded, copying Jen Brenner, Senior Counsel, stating that although "B Level does have additional privileges," the "policy does state that it is the Warden's discretion," and that "[a]t this time, Warden Fisher has determined that for the time being that visits will remain non-contact."

85.     Defendant Fisher has routinely denied requests for contact legal visits without any rationale.

86.     Defendant Fisher also denied Ms. Pike's requests for video conference and contact visitation with a psychological expert in 2021.

87.     The expert engaged for Ms. Pike's defense has been unable to perform their duties due to these denials. This expert requires confidential visits with Ms. Pike in order to adequately evaluate her and develop opinions for use in her ongoing legal proceedings. Despite Ms. Pike's post-conviction counsel repeatedly instructing Defendants of the dire need for these visits, they were repeatedly denied.

88.     For non-contact legal visits, Defendants' practices threaten Ms. Pike's confidentiality and attorney-client privilege. In early 2022, Defendant Jones said to Ms. Pike that he was instructed to sit in on attorney visits and has refused to sit outside of earshot during many legal visits.

89.     Since her move to Level A, "contact visits" with counsel have been closely monitored and lack confidentiality. Ms. Pike is not allowed to move from the box marked on the floor unless instructed to do so, and guards and/or Unit Manager Jones sit immediately outside the

doors. It is apparent throughout these visits that the guards can and do hear the conversations with counsel.

90.     Taken together, Defendants' formal policies, facility-level practices, and discretionary actions and decisions as applied to Ms. Pike operate to keep her in solitary confinement with no social engagement with other incarcerated individuals or prison staff, no educational or religious programming, and nearly no physical contact with another human being besides an exam by the occasional healthcare provider or the incidental touch of a guard's hands when she is being restrained.

### E.    The Effect of Ms. Pike's Living Conditions

91.     Solitary confinement of such prolonged duration has caused substantial harm and continues to place Ms. Pike at risk of substantial harm for each and every day that it endures.

92.     Ms. Pike's prolonged and indefinite detention in solitary confinement presents an atypical and significant hardship to Ms. Pike in relation to other prisoners, even those sentenced to death, who are able to have contact visits, time outside their cells, participation in activities, and human contact.

93.     Ms. Pike has suffered significant deterioration of her physical health as a result of her solitary confinement. Her mobility has been severely restricted and she has almost no ability to meaningfully exercise. Due to her physical constraints, Ms. Pike has gained weight, her eyesight is greatly diminished, and she struggles to sleep well. Because her stark, unchanging, and barren environment, Ms. Pike has become hypersensitive to external stimuli. She is unable to normally process new sounds, smells, or people that come into her environment, but experiences these as foreign and significantly disruptive. This hypersensitivity means that she can hear noises from across the pod at all hours of the day, even though there is plate glass that covers her steel door to

muffle the connection she has to the outside world. At the same time, she has lost sensitivity to light due to the permanent fluorescent light that shines through her doorway twenty-four hours per day, causing significantly reduced visibility. These physical harms are compounded by the effect that her solitary-induced mental health conditions have on her motivation and ability to sleep, and the extreme stress placed on her by her conditions of confinement.

94.     In addition to the substantial harm to her physical health, Ms. Pike has suffered ongoing harm to her mental health.  Ms. Pike had a history of psychological, emotional, and cognitive impairment before she was committed to permanent solitary confinement, having been previously diagnosed with bipolar disorder, depressive disorder, obsessive-compulsive disorder, and post-traumatic stress disorder.[8]  That fact is well known to the Defendants through, among other means, their involvement in her post-conviction litigation and various communications by her medical team to prison leadership. The conditions under which Ms. Pike is confined—alone, in her cell for twenty-three hours a day, seven days a week, 365 days a year—exacerbate her underlying psychological conditions due to the sensory, social, and physical deprivation that accompany this extreme form of punishment.

95.     Ms. Pike has lost all ability to focus on discrete tasks, has rapid mood changes, and experiences consistent emotional instability. Her isolation continually exacerbates her underlying bipolar disorder, so she experiences frequent cycles of manic agitation, where she will pace endlessly, bang on her door, or convulse or tense her entire body, and periods of depression characterized by hopelessness, powerlessness, and thoughts of suicide.

---

[8] Ms. Pike also suffered severe physical and sexual abuse and neglect as a child.  *See* https://www.mercyforchrista.org/post/trauma.

96.     Due to her prolonged isolation, Ms. Pike has repeatedly attempted suicide or engaged in self-harming behaviors. For example, in 2007, Ms. Pike used a razor blade to cut her forearm, and in July 2020, she was hospitalized after a suicide attempt.  A Suicide Risk Assessment completed by Eric Gauen, Mental Health Clinical Director on July 20, 2020 cited "20+ years of restrictive housing" among the risk factors for Ms. Pike. Today, Ms. Pike instinctively flinches on the rare occasion that a person touches her, and she experiences chronic migraines.

97.     Ms. Pike has access to medical professionals, but her requests for physician visits are often denied or delayed. Furthermore, all of her medical and counseling visits lack any privacy or confidentiality. Counselors and case managers have instructed her explicitly that they will relay any and all information that she shares with prison leadership.

98.     Counseling services are provided either through Ms. Pike's pie-flap in her cell door, where all other individuals incarcerated around her can listen in to the private details of her life, or "through the glass" in the non-contact visiting rooms. All other individuals incarcerated in Ms. Pike's pod are allowed to have individualized counseling sessions in private, contact-visit rooms. Ms. Pike has recently declined counseling visits due to the inherent stigma and lack of privacy for these sessions. In connection with her advancement to Level A, Ms. Pike is supposed to receive counseling services in the multipurpose room in her Pod, but these visits would also be monitored by an officer and a supervisor and lack privacy.

99.     Over the years, Ms. Pike has had several psychological evaluations and reviews by psychological experts, which have universally found that solitary confinement for twenty-three to twenty-four hours per day has had a direct deleterious effect on her psychological wellbeing. These findings are well-known to Defendants.

100.    In 2001, Ms. Pike was evaluated by Dr. Stuart Grassian. Dr. Stuart Grassian is a board-certified psychiatrist who was previously on the faculty of Harvard Medical School. He has extensive experience analyzing the psychiatric effects of stringent conditions of confinement. He has testified as an expert in civil and criminal lawsuits regarding the impact of conditions of confinement on incarcerated individuals, both with regard to their psychological well-being and their ability to contribute to their own legal defense.

101.    The evaluation, which is a part of her TDOC record, was requested because Ms. Pike indicated her intention to drop all of her post-conviction appeals. It was apparent that this decision was very likely tainted by her despair surrounding the conditions of her confinement. At twenty-five, Ms. Pike had been in solitary confinement for over five years.

102.    In determining that Ms. Pike's five-plus years of mandatory segregation had likely influenced her decision to drop her appeals, Dr. Grassian observed that Ms. Pike had developed a major psychiatric illness, Obsessive Compulsive Disorder, since her incarceration in solitary confinement. He notes that this is one of the "most truly characteristic of the psychopathological results of prolonged solitary confinement."  He further finds that individuals who previously suffered from bipolar mood disorder, like Ms. Pike, "are among the most vulnerable of all to the development of psychopathologic effects of solitary confinement."

103.    He ultimately concluded that concerns that Ms. Pike's decision-making is "the product of a psychologically vulnerable individual whose emotion and rational capacity has been undermined by the severe stress of prolonged solitary confinement" were "well-founded."

104.    Ms. Pike went on to be subject to mandatory segregation for another twenty years.

105.    Dr. Ali Winters, a licensed social work clinician who has also worked with Ms. Pike, has explained that solitary confinement has had direct ruinous effects on Ms. Pike's physical,

27

mental, and emotional well-being. She concluded that Ms. Pike's conditions of Bipolar Disorder I and Post-Traumatic Stress Disorder are exacerbated by solitary confinement, and they result in mental instability that manifests in a myriad of ways, including inability to concentrate, anxiety, irritation, mania and depression, and severe alternations in mood, cognitions, arousal, and reactivity. The medical care available to Ms. Pike is simply unable to alleviate the mental health issues caused by and exacerbated by solitary confinement.

106. Consistent with the findings made by Ms. Pike's physicians, neuroscience has established that prolonged isolation damages brain function and physically diminishes parts of the brain.[9] That damage includes memory loss, cognitive decline, and depression.[10]

107. Studies indicate that social isolation is a form of stress that is associated with psychiatric and neurological disorders including anxiety, depression, schizophrenia, epilepsy, and memory loss, in addition to endocrinological changes.[11] Social isolation is also associated with a reduction in medial prefrontal cortex volume.[12]

108. Dr. Grassian in his work as a researcher has even identified a "specific psychiatric syndrome" linked to solitary confinement, characterized by hyperresponsivity to external stimuli; perceptual distortions, illusions, and hallucinations; panic attacks; difficulties with thinking,

---

[9] *See, e.g.,* Stephanie Cacioppo et al., *Toward a Neurology of Loneliness*, 140(6) PSYCHOL. BULL. 1464 (2014); Craig Haney, *The Science of Solitary: Expanding the Harmfulness Narrative*, 115 NW. U. L. REV. 211, 221–35 (2020) (surveying the scientific literature on the impact of social isolation on health and explaining that "we now have more than sufficient data to conclude that solitary confinement is a harmful practice").

[10] *See, e.g.,* Dana G. Smith, Neuroscientists Make a Case against Solitary Confinement, SCIENTIFIC AMERICAN (Nov. 9, 2018), https://www.scientificamerican.com/article/neuroscientists-make-a-case-against-solitary-confinement/.

[11] Faiza Mumtaz et al., *Neurobiology and Consequences of Social Isolation Stress in Animal Model—A Comprehensive Review*, 105 BIOMED. & PHARMACOTHER. 1205 (2018).

[12] Mirjam Schubert et al., *Effects of Social Isolation Rearing on the Limbic Brain: A Combined Behavioral and Magnetic Resonance Imaging Volumetry Study in Rats*, 159 NEUROSCIENCE 21 (2009).

28

concentration, and memory; intrusive obsessional thoughts; overt paranoia; and problems with impulse control.[13] These symptoms are emblematic of an acute organic brain syndrome.[14]

109. Ms. Pike's deepening diagnosed physiological and mental health problems are well established adverse reactions to prolonged solitary confinement.

110. The duration of Ms. Pike's mandatory segregation and the corresponding deprivations of basic human needs such as social interaction, environmental stimuli, exercise, sleep, and proper psychological and medical care which attend Ms. Pike's long-term isolation demonstrate that her conditions of confinement are so objectively serious as to constitute a denial of the minimal civilized measure of life's necessities.

111. Despite the obvious and thoroughly documented risks and harms that result from long-term solitary confinement, and despite knowing of Ms. Pike's underlying diagnoses and exacerbated mental health conditions, Defendants have been deliberately indifferent to the psychiatric and emotional harm caused by her solitary confinement. Defendants have failed to provide adequate treatment for her conditions and have failed to provide meaningful reductions on the restrictions applied to her in order to reduce the severity of the ongoing harm.

### F. TDOC and DJRC Officials Have Been On Notice of the Ongoing Harm of Isolation and Failed to Take Any Reasonable Steps to Prevent Future Harm.

112. TDOC and DJRC officials, including Defendants, have been notified of the acute and ongoing harm perpetuated by Ms. Pike's continued isolation for years. They have been notified through individual discussions; letters; communications from experts, medical personnel, and case workers; ongoing legal proceedings; expert evaluations; and litigation regarding isolation procedures.

---

[13] Stuart Grassian, <u>Psychiatric Effects of Solitary Confinement</u>, 22 WASH. U. J. L. & POL'Y 325, 335–36 (2006).
[14] *Id.* at 337–38.

113.     Ms. Pike's mental health records themselves reflect the staggering impact of her isolation. These records also reflect how the withholding of privileges, demotions and failures to promote Ms. Pike through the Level System, and poor treatment by prison officials exacerbate a hopeless situation. Numerous progress updates signed by DJRC's mental health providers in 2020 and early 2021 reflect ongoing struggles with "imposed isolation." For example, a Problem Oriented Progress Record from April 8, 2020, signed by Pam Monjar, LPC-MHSP, stated that Ms. Pike "would benefit from having the opportunity to work." Another dated October 26, 2020, stated that Ms. Pike "continues to struggle with navigating isolation and not having access to her art supplies," and that Ms. Pike "would like the same access afforded to men on death row." Another still from February 2, 2021, reported that Ms. Pike "continues to struggle with imposed isolation."

114.     Precedent cited below and widely published psychological and penological academic literature describing and quantifying mental health effects of prolonged solitary confinement have also put Defendants on notice of the ongoing harm. *See, e.g.*, *Porter v. Clarke*, 923 F.3d 348, 356 (4th Cir. 2019) (citing Br. Amici Curiae Profs. & Practitioners of Psychiatry & Psychology in Supp. of Pls.–Apps. and Affirmance) (extensively citing to the body of scientific research regarding solitary confinement, which "regardless of methodology, has produced strikingly consistent results: the deprivation of meaningful social contact and positive environmental stimulation characteristic of solitary confinement subjects prisoners to grave psychological and physiological harms.").

115.     Existing court precedent has established that long-term placement in solitary confinement results in the deprivation of basic human needs. *See, e.g., In re Medley,* 134 U.S. 160, 168, (1890); *Davis v. Ayala,* 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring) ("[R]esearch

30

still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price.").

116.    The Fourth Circuit Court of Appeals has found that "[p]rolonged solitary confinement exacts a heavy psychological toll that often continues to plague an inmate's mind even after he is resocialized." *Incumaa v. Stirling*, 791 F.3d 517, 534 (4th Cir. 2015). The Third Circuit has also evaluated the "robust body of scientific research on the effects of solitary confinement" and found a "scientific consensus" that such confinement "is psychologically painful, can be traumatic and harmful, and puts many of those who have been subjected to it at risk of long-term. . . damage." *Williams v. Sec'y Penn. Dep't of Corr.,* 848 F.3d 549, 566-67 (3d Cir. 2017), *cert denied sub nom. Walker v. Farnam,* 138 S. Ct. 357 (2017), and *cert denied sub nom. Williams v. Wetzel,* 138 S. Ct. 357 (2017); *see also, e.g., Grissom v. Roberts,* 902 F.3d 1162, 1176-77 (10th Cir. 2018) (Lucero, J., concurring) (reviewing academic literature and determining that "solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill . . . . These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement.").

117.    A number of courts have also found—based on empirical evidence—that solitary confinement poses an objective risk of serious psychological and emotional harm to incarcerated individuals, and therefore can violate the Eighth Amendment. *See, e.g.*, *Johnson v. Wetzel,* 209 F. Supp. 3d 766, 777-78, 782 (M.D. Pa. 2016) (holding that the Eighth Amendment protects an incarcerated individual's physical and mental health, and the denial of basic human needs caused by long-term isolation violates the Eighth Amendment); *Palakovic v. Wetzel,* 854 F.3d 209, 225-26 (3d Cir. 2017) ("acknowledg[ing] the robust body of legal and scientific authority recognizing the devastating mental health consequences caused by long-term isolation in solitary

31

confinement"); *Ashker v. Brown,* No. C 09-5796, 2013 WL 1435148, at *4-5 (N.D. Cal. Apr. 9, 2013); *Wilkerson v. Stalder,* 639 F. Supp. 2d 654, 678-79 (M.D. La. 2007) ("It is obvious that being housed in isolation in a tiny cell for 23 hours a day for over three decades results in serious deprivations of basic human needs."); *cf. McClary v. Kelly,* 4 F. Supp. 2d 195, 208 (W.D.N.Y. 1998) ("[T]hat prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this Court as rocket science.").

118.    Most recently, the Fourth Circuit Court of Appeals found that "the challenged conditions of confinement on Virginia's death row -- under which [inmates] spent, for years, between 23 and 24 hours a day alone, in a small . . . cell with no access to congregate religious, educational, or social programming -- pose a substantial risk of serious psychological and emotional harm." *See Porter v. Clarke,* 923 F.3d 348, 357 (4th Cir. 2019) (internal quotations omitted).

119.    The risks associated with being forced to live in a very small concrete and steel area, in complete isolation for over twenty-five years are so obvious that no reasonable person can claim to be unaware of them.

120.    Despite being on actual notice of the harms of severe mental pain and suffering caused by Ms. Pike's long-term solitary confinement, Defendants have turned a blind eye and refused to take any action.  Despite their knowledge of the risks, Defendants have held Ms. Pike in solitary confinement without any well-founded penological purpose. Given their active involvement similar litigation over the years, Defendants knew that their actions would violate Ms. Pike's constitutional and statutory rights.

121.    Defendant Helton is the state official with the authority and position to effectuate positive change. As Interim Commissioner of TDOC, Defendant Helton has the authority to

provide adequate training, increased pay commensurate with that training, additional personnel, improved living conditions, meaningful review procedures, and ultimately an alternative to indefinite segregation. She has the ultimate authority to grant policy exceptions.

122. Upon information and belief, Defendant Dotson is a state official with authority to approve facility-level policies and procedures developed by DJRC's Warden that relate to Ms. Pike's living conditions, including whether women at DJRC are subject to the Mandatory Segregation Policy, to review and make recommendations regarding policy exceptions, and to make changes to Ms. Pike's living conditions.

123. Defendant Fisher is the prison official with authority to enact policies specific to DJRC or request policy exemptions from TDOC. Defendant Fisher has authority to provide adequate training, additional personnel, meaningful review, improved living conditions, and alternatives to indefinite segregation.

124. Defendant Barlow is a prison official with authority to implement rules, procedures, and privileges for all individuals incarcerated at DJRC, including those under a sentence of death. He has the authority to make changes to Ms. Pike's Program Level, living conditions, security classification, privileges afforded, and other security operations as it relates to Ms. Pike, and in particular is authorized to approve contact visits for Ms. Pike.

125. Defendant Baker is a prison official with authority to implement rules, procedures, and privileges for all individuals incarcerated at DJRC, including those under a sentence of death. She has authority to make changes to Ms. Pike's living conditions and medical treatment, including through her oversight of the inmate grievance process and participation in the monthly review process for individuals held in mandatory segregation.

33

126.    Defendant Jones is the prison official with responsibility for implementing rules and procedures for individuals within Unit Three at DJRC. He has authority to review and approve recommendations to change Ms. Pike's living conditions, including in his roles on the Unit Review Panel responsible for assigning Ms. Pike to a Program Level, through participation in the monthly review process for individuals held in mandatory segregation, and through the oversight of daily operations within his Unit.

127.    Defendants know of Ms. Pike's numerous and public psychological evaluations, have been notified of the harm being done to her continually by various medical professionals working for and independent of the prison for years. Defendants have been on notice of the severe, irreparable, and acute harms of Ms. Pike's segregation for decades and have taken no action whatsoever to prevent further harm.

128.    Defendants' decision to keep Ms. Pike in a permanent state of mandatory solitary confinement inflicts, and will continue to inflict, great mental and physical suffering upon Ms. Pike.

**G.    *Men Under a Sentence of Death Are Treated Substantially Differently Than Ms. Pike.***

129.    Men under a sentence of death in Tennessee are given substantially more freedoms, jobs, social activities, recreation, positive human contact, opportunities for education, programming, and spiritual activities, and meaningful access to the Level System. Because Ms. Pike is the sole woman sentenced to death in Tennessee, even after receiving new supposed privileges under her Program Level, she has absolutely none of these necessities of life.

130.    Riverbend houses male prisoners from minimum to maximum security levels and houses all 46 men sentenced to death in Tennessee in Unit Two.  As mentioned above, men at Riverbend who are sentenced to death generally have the opportunity to participate in group

34

activities, education, programming, and enjoy freedom of movement. Generally, men sentenced to death at Riverbend who are placed in punitive segregation due to behavioral infractions are quickly returned to the population in Unit Two, and their confinement in administrative segregation is protected by a meaningful review system.

131.     The men in Unit Two at Riverbend are segregated from the general population at Riverbend. However, they have social interaction, educational activities, and recreation with each other. They are able to create meaningful friendships with one another during the decades that they are incarcerated together. Prison officials at Riverbend frequently state that Unit Two is among the most safe, calm, and well-behaved in the entire prison.

132.     The fact that these individuals are under a sentence of death does not mean that they are more violent, difficult to handle, or poorly-behaved than other individuals incarcerated with lower sentences. It is in fact the opposite.

133.     The behavior of the men in Unit Two shows that there is no reason to treat individuals as a higher safety risk solely on the basis of their sentence of death.

134.     Furthermore, there are men sentenced to death with histories of significant violence while incarcerated that are not subject to the extreme isolation Ms. Pike experiences.

135.     For example, before he was executed, Nick Sutton was sentenced to death for his participation in the targeted killing of another incarcerated individual. Sutton was not subjected to years of solitary confinement. Instead, he was given freedom of movement throughout Unit Two and a significant position of trust as the handyman of the Unit. He was allowed to have access to tools and materials otherwise generally prohibited in prison environments.

136.     Other men with significant histories of violence while incarcerated at Riverbend have similarly not been subject to the same extreme, decades-long isolation as Ms. Pike.

35

137.    Recently, as the result of litigation, Riverbend has begun enacting significant changes for those few individuals that were subject to long-term solitary confinement. At least one plaintiff, Jon Hall, has been released from solitary confinement. Riverbend has agreed to install secure cages around the doors of other segregated individuals, so that they can freely converse with and interact with others in the Unit.

138.    Also as the result of litigation, TDOC revised Policy 503.03 relating to the Program Level System applied to individuals under a sentence of death. The changes reduce the amount of time an individual spends at Level C before being eligible for elevation and the amount of time that a person must spend at a lower level in response to behavioral issues, require the regular evaluation and input of a behavioral health team, and require that specific reasons for unit level review decisions be stated on the record and include consideration of behavioral health concerns identified during the course of evaluation. The changes also require two hours of exercise each day and the opportunity to participate in private out-of-cell meetings with mental health staff at Level C.

139.    Even if all the Program Level policy changes are applied to Ms. Pike, she would still have no one with whom to exercise any less restrictive privileges so long as the Mandatory Segregation policy is in place to segregate her, as the only woman sentenced to death, from the general population at DJRC.

## CLAIMS FOR RELIEF

## COUNT I:

**Cruel and Unusual Punishment in Violation of the Eighth Amendment to the
United States Constitution
42 U.S.C. § 1983**

36

140.     Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

141.     The Eighth Amendment to the United States Constitution prohibits the infliction of cruel and unusual punishment.

142.     A prisoner's conditions of confinement can constitute cruel and unusual punishment under the Eighth Amendment. The Eighth Amendment requires officials to provide humane conditions of confinement.

143.     TDOC's Mandatory Segregation Policy for individuals sentenced to death, and Defendants' enforcement of it, subjects Ms. Pike to unconstitutional solitary confinement because there are no other individuals sentenced to death with whom she can interact under the policy.

144.     Moreover, by withholding or manipulating privileges available to her under the Program Level system, Defendants have subjected Ms. Pike to unconstitutional solitary confinement by preventing her from having meaningful interactions with other individuals including DJRC officials and other staff working within DJRC, her legal counsel, her spiritual advisors, and other personal visitors including her family.

145.     Through the enforcement of the TDOC Mandatory Segregation Policy and the withholding or manipulating of privileges under the Program Level system, Defendants have deprived and continue to deprive Ms. Pike of the minimal civilized measure of life's necessities for a prolonged period, including the basic human need for socialization, interaction, and physical contact. Defendants have violated Ms. Pike's basic human dignity and right to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution for each of the reasons set forth below.

146.    The cumulative effect of prolonged solitary confinement, along with the deprivation of adequate mental healthcare, constitutes a serious deprivation of at least one of her basic human needs, including but not limited to normal human contact, environmental and sensory stimulation, mental and physical health, physical exercise, sleep, nutrition, and meaningful activity.

147.    The prolonged period during which Ms. Pike has been deprived of these basic human needs has exacted and is currently exacting severe psychological pain and suffering, as well as permanent psychological and physical injury on Ms. Pike.

148.    In addition to current psychological and physical harms, Ms. Pike faces the prospect of remaining in solitary confinement for the rest of her life, until her pending execution date. Her pending execution date renders the need to rectify these deprivations of basic human needs even more urgent, so that her rights may be restored and she may have the comfort of meaningful interactions and physical contact with her loved ones during the time that she has remaining.

149.    Finally, Defendants' continuation of Ms. Pike's solitary confinement for over twenty-five years under debilitating and extreme conditions fails to honor her basic dignity and humanity in violation of contemporary standards of human decency and constitutes cruel and unusual treatment prohibited by the Eighth and Fourteenth Amendments to the U.S. Constitution.

150.    Defendants' actions, individually and collectively, in depriving Ms. Pike of human contact, environmental and sensory stimulation, physical exercise, sleep, nutrition, meaningful activity, and mental health treatment are not legitimately related to security or other penological needs of isolating a prisoner from others, but rather are an arbitrary exercise of power.

151.   The policies and practices complained of in this Complaint have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities.

152.   Over the years, Ms. Pike has repeatedly requested relief from these debilitating conditions of confinement. Mental health providers have also documented suffering related to Ms. Pike's prolonged segregation.

153.   Defendants have been and are aware of all deprivations complained of herein, and have ordered, condoned, or been deliberately indifferent to such conduct.

154.   It should be obvious to Defendants and to any reasonable person that Ms. Pike's conditions of confinement for such a long period of time causes extreme psychological pain and suffering. Furthermore, Defendants have been made aware of Ms. Pike's suffering through administrative grievances and written complaints. Defendants have been deliberately indifferent to the serious physical and psychological harm being inflicted on Ms. Pike.

## COUNT II:

**Violation of the Procedural Due Process Clause of the Fourteenth Amendment**
**42 U.S.C. § 1983**

155.   Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

156.   Defendants, acting under color of state law in their official capacities, have deprived Ms. Pike of a liberty interest without due process of law by: (1) failing to provide Ms. Pike with notice of what she can do to get relief from the conditions of her solitary confinement; (2) failing to provide meaningful periodic review of Ms. Pike's conditions of confinement; and (3) failing to provide a meaningful appeal of those periodic reviews. Defendants' arbitrary decision

39

and their denial of due process violate the Fourteenth Amendment to the United States Constitution.

157. The duration of Ms. Pike's solitary confinement and the severity of the conditions of that confinement constitute an atypical and significant hardship as compared with the ordinary incidents of prison life due to: (1) the extremely harsh and isolated conditions of her solitary confinement; (2) the lengthy duration of her solitary confinement; and (3) the cumulative adverse physical and psychological effects stemming from such confinement.

158. Ms. Pike has been placed in the extreme conditions described in this Complaint for nearly twenty-five years. Upon information and belief, this prolonged placement in solitary confinement is atypical in comparison to the ordinary disciplinary and administrative segregation imposed in Tennessee for individuals sentenced to death or otherwise.

159. Because indefinite commitment to solitary confinement constitutes a significant and atypical hardship, Ms. Pike is entitled to meaningful notice of reasoned decision-making for custody and classification decisions, and how she might alter her behavior to get relief, as well as meaningful and timely periodic reviews and appeals to determine whether solitary confinement is still appropriate. Defendants have denied and continue to deny any such notice or meaningful review.

160. Defendants, acting under color of state law in their official capacities, also violate Ms. Pike's due process rights by retaining her in conditions that amount to an atypical and significant hardship without legitimate penological interest. Ms. Pike has had few and relatively minor disciplinary infractions in the preceding decade, and thus this detention occurs without reliable evidence that providing relief from the harsh conditions of solitary confinement will present a danger to the safety and security of other prisoners or prison staff.

40

# COUNT III:

## Violation of the Fourteenth Amendment Right to Equal Protection
## 42 U.S.C. § 1983

161.    Ms. Pike incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

162.    Because she is a woman, Ms. Pike is confined to DJRC and not to Riverbend.

163.    Defendants, acting under color of state law in their official capacities, have denied Ms. Pike the equal protection of the law. TDOC's Mandatory Segregation Policy applies to men sentenced to death who reside at Riverbend, in that men sentenced to death are segregated from men who are not sentenced to death within Riverbend. However, unlike in Ms. Pike's case, such application of TDOC's Mandatory Segregation Policy to men at Riverbend does not result in effective solitary confinement.

164.    Men who are sentenced to death are able to enjoy freedom of movement without restraints, job assignments, meals, and other social interactions within Unit Two, subject to the limitations of their Program Level assignments. At DJRC and as the only woman under a sentence of death, Ms. Pike is not afforded similar opportunities under the Mandatory Segregation Policy and the Program Level System.

165.    Moreover, men sentenced to death at Riverbend have committed the same or similar infractions without being placed in solitary confinement at all or have been placed in solitary confinement for a shorter period of time. Men at Riverbend have also committed worse infractions than Ms. Pike has and have either avoided the same level of solitary confinement as Ms. Pike or have been released from those confinement conditions.

166.    Further, Defendants' refusal to allow Ms. Pike the privileges associated with her assignment to Level A are the result of animus directed toward Ms. Pike. Other individuals

41

sentenced to death are regularly afforded all privileges available under their assigned Program Levels without such privileges being discretionarily and arbitrarily withheld or manipulated.

167.     Ms. Pike has been treated differently than similarly situated male individuals—men with a sentence of death—without an important state interest that is substantially related to her conditions to justify the differential treatment.  Ms. Pike has therefore suffered both gender-based equal protection violations and, in the alternative, equal protection violations under the class-of-one theory.

## COUNT IV:

**Violation of the First and Fourteenth Amendment Right to Access the Courts
42 U.S.C. § 1983**

168.     Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

169.     "The Constitution protects an individual's access to the judicial system—the right to bring a non-frivolous claim in a court of law." *Green v. City of Southfield, Mich.*, 925 F.3d 281, 285 (6th Cir. 2019) (citing *Christopher v. Harbury*, 536 U.S. 403, 415, n.12 (2002)).

170.     Ms. Pike's defense counsel has repeatedly requested, and been denied, contact legal visits for themselves and an expert witness during the course of her ongoing post-conviction defense proceedings.  "Contact" visits allowed under Ms. Pike's new Level A classification are decidedly not contact visits and are continually monitored.

171.     As a result of Defendants' denial of contact legal visits, Ms. Pike has been unable to pursue her clemency petition in a timely and adequate manner. Ms. Pike has suffered actual harm and prejudice in pursuing this underlying litigation, which is critical and substantive post-conviction litigation. Most egregiously, Ms. Pike has been unable to participate in a confidential,

contact visit with the psychological expert she has retained through counsel in support of her clemency proceedings.

172.    Ms. Pike has been denied meaningful access to the courts because she has been denied legal contact visitation pursuant to policies or practices of TDOC and DJRC that serve no legitimate penological interest.

173.    The right to access to courts should be treated with heightened care when the claimant's underlying litigation is a suit to stop a prisoner's execution.

174.    Ms. Pike's inability to meaningfully access the courts has resulted in a denial of her rights under the First and Fourteenth Amendments.

## COUNT V:

### Violation of Right to Counsel Under 18 U.S.C. § 3599
### 42 U.S.C. § 1983

175.    Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

176.    As a financially unable and death-eligible defendant, Ms. Pike is entitled to representation throughout her post-conviction process, including clemency proceedings, pursuant to 18 U.S.C. § 3599.

177.    Ms. Pike has been denied her right to representation pursuant to 18 U.S.C. § 3599 during her time in solitary confinement, as she has been denied contact visits, visits respecting the attorney-client privilege, and other adequate representation as contemplated under the statute.

178.    As stated above, Ms. Pike's counsel has repeatedly requested, and been denied, contact legal visits for themselves and an expert witness during the course of her ongoing post-conviction defense proceedings.

43

179. Ms. Pike's inability to have contact visits with her legal counsel makes it much more challenging to review documents, draft filings, gather facts, and obtain signatures, among other things, as all documents, writings, releases, etc., must be sent through the mail, which DJRC officials are then able to inspect. These deprivations and delays are particularly harmful where the sentence at stake is death and time is of the essence. Ms. Pike's execution date could be set at any time, and counsel is unable to work as quickly as needed on Ms. Pike's clemency petition when faced with such signification logistical hurdles.

## COUNT VI:

### Violation of Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1
### 42 U.S.C. § 1983

180. Plaintiff incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

181. Ms. Pike has been denied visits from her spiritual adviser during her time in solitary confinement.

182. This denial constitutes a substantial burden on the exercise of her religion, and the denial does not further a compelling interest that cannot be achieved through any other less restrictive means. Thus, Defendants have violated the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc-1, *et seq*.

## COUNT VII:

### Violation of Americans With Disabilities Act, 42 U.S.C. § 12132, *et seq*
### 42 U.S.C. § 1983

183. Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

44

184.    The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of the public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

185.    The ADA applies to individuals incarcerated in state prison. *Penn. Dept. of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

186.    Mental illness is a disability within the ambit of the ADA. 42 U.S.C. § 12102(1)(A) (defining disability as "a physical or mental impairment that substantially limits one or more major life activities of such individual").

187.    Ms. Pike suffers from multiple severe mental impairments, as well as vision impairments, sleep problems, and reduced mobility.

188.    Ms. Pike has been diagnosed with bipolar disorder, depressive disorder, obsessive-compulsive disorder, and post-traumatic stress disorder. She has experienced a decline in her vision and is unable to be outside without sunglasses due to heightened sensitivity. There is a record of such impairments within the meaning of 42 U.S.C. § 12102.

189.    Alternatively, Defendants have regarded Ms. Pike's mental impairments, vision impairments, sleep problems, and reduced mobility, as substantially limiting one or more of Ms. Pike's major life activities.

190.    Ms. Pike's mental illness, even when mitigated through medical treatment, constitutes a mental impairment that substantially limits her in several major life activities, including, but not limited to, learning, reading, concentrating, thinking, and communicating, in addition to other neurological limitations. These limitations on her life activities have a profound effect on Ms. Pike's life.

191.    Ms. Pike's vision impairment, difficulties sleeping, and reduced mobility have likewise affected her ability to learn, read, concentrate, think, and communicate.

192.    Ms. Pike is a qualified individual with a disability as defined in 42 U.S.C. § 12132.

193.    Defendants have knowledge of Ms. Pike's disabilities.

194.    On multiple occasions, Defendants have deliberately ignored reports by DJRC mental health staff that Ms. Pike was suffering due to imposed isolation and recommendations that Ms. Pike's conditions of confinement be adjusted to accommodate or mitigate the effects of her mental illness.

195.    Defendants are public entities within the meaning of 42 U.S.C. § 12131.

196.    DJRC is a public entity that provides services including, but not limited to, rehabilitation programming, medical care, and mental health care.

197.    In Ms. Pike's case, enforcement of the Mandatory Segregation Policy results effectively in solitary confinement and is a denial of and/or results in the denial of the services, programs, and activities that DJRC offers incarcerated individuals to rehabilitate and/or address mental, emotional, and physical health issues.

198.    Ms. Pike is qualified, by virtue of her lack of recent serious disciplinary infractions and assignment to Level A under the Program Levels System, to be housed in less restrictive conditions, to receive additional privileges, and to participate in programming provided to other inmates at DJRC.

199.    Defendants have denied Ms. Pike the benefits of less restrictive housing and programming by housing her in mandatory segregation. Specifically, Ms. Pike has been denied access to group socialization, activities, programming, group therapy, and proper medical and mental health treatment because of her placement in mandatory segregation.

46

200. By denying Ms. Pike these benefits and applying its discriminatory policies in a disparate manner based on Ms. Pike's disability or perceived disability, Defendants have violated the ADA. Defendants' discrimination was and continues to be intentional and/or represents deliberate indifference to the strong likelihood that the actions and/or omissions, and to the extent applicable, adoption of the policies that led to these actions and/or omissions, would likely result in a violation of federally protected rights.

201. Defendants' discriminatory actions and/or omissions are the proximate cause and cause in fact of Ms. Pike's injuries and an exacerbation of her mental illness and physical impairments and Ms. Pike has suffered and will continue to suffer damage.

202. Defendants have violated Ms. Pike's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*.

## COUNT VIII:

**Violation of Americans With Disabilities Act**
**by Failure to Accommodate Pike's Disability, 42 U.S.C. § 12132, *et seq***
**42 U.S.C. § 1983**

203. Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

204. Defendants are required to provide reasonable accommodations and/or modifications in policies, practices, or procedures needed by qualified mentally ill or physically disabled individuals such as Ms. Pike to benefit from the services provided by DJRC.

205. Defendants have been informed of Ms. Pike's disabling conditions.

206. By applying the Mandatory Segregation Policy to Ms. Pike, Defendants have failed to reasonably accommodate Ms. Pike's mental health conditions, vision impairment, sleeping difficulties, and reduced mobility by placing her in prolonged solitary confinement and denying

47

her participation in programming. The withholding of environmental stimulation, meaningful recreation, and human contact, among other deprivations of basic human needs, has caused or exacerbated her mental health conditions and other physical disabilities.

207.    Defendants' failure to make reasonable accommodations is tantamount to denying access and is a violation of the ADA.

208.    These accommodations are available to Defendants and would have been, and will be, effective without positing undue hardship to Defendants.

209.    Defendants' discriminatory actions and/or omissions are the proximate cause and cause in fact of Ms. Pike's injuries and an exacerbation of her mental illness and physical impairments, and Ms. Pike has suffered and will continue to suffer damage.

210.    Thus, Defendants have violated Ms. Pike's rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, *et seq*.

## COUNT IX:

### Violation of the Rehabilitation Act, 29 U.S.C. § 794
### 42 U.S.C. § 1983

211.    Ms. Pike incorporates by reference the allegations contained in the preceding and subsequent paragraphs as if set forth fully herein.

212.    Upon information and belief, TDOC receives federal funding.

213.    Ms. Pike suffers from multiple severe mental impairments. She has been diagnosed with bipolar disorder, depressive disorder, obsessive-compulsive disorder, and post-traumatic stress disorder.

214.    Ms. Pike also suffers from vision impairments, difficulties with sleeping, and reduced mobility.

48

215. Ms. Pike is qualified, by virtue of her lack of recent serious disciplinary infractions and assignment to Level A under the Program Levels System, to be housed in less restrictive conditions, to receive additional privileges, and to participate in programming provided to other individuals at DJRC.

216. Defendants have denied Ms. Pike the benefits of less restrictive housing and programming by housing her in mandatory segregation. Specifically, Ms. Pike has been denied access to group socialization, activities, programming, group therapy, and proper medical and mental health treatment because of her placement in mandatory segregation.

217. By denying Ms. Pike these benefits and applying its discriminatory policies in a disparate manner based on Ms. Pike's disability or perceived disability Defendants' have violated the Rehabilitation Act. Defendants' discrimination was and continues to be intentional and/or represents deliberate indifference to the strong likelihood that the actions and/or omissions, and to the extent applicable, adoption of the policies that led to these actions and/or omissions, would likely result in a violation of federally protected rights.

218. Defendants' discriminatory actions and/or omissions are the proximate cause and cause in fact of Ms. Pike's injuries and an exacerbation of her mental illness or physical impairments and Ms. Pike has suffered and will continue to suffer damage.

219. Defendants are required to provide reasonable accommodations and/or modifications in policies, practices, or procedures needed by qualified mentally ill or physically disabled individuals such as Ms. Pike to benefit from the services provided by DJRC.

220. Defendants have been informed of Ms. Pike's disabling conditions.

221. Defendants have also failed to accommodate Ms. Pike's mental health conditions, vision impairment, sleeping difficulties, and reduced mobility by placing her solitary confinement

49

and denying participation in programming. The withholding of environmental stimulation, meaningful recreation, and human contact, among other deprivations of basic human needs, has caused or exacerbated her mental health conditions and other physical disabilities.

222.     Defendants' failure to make reasonable accommodations is tantamount to denying access and is a violation of the Rehabilitation Act.

223.     These accommodations are available to Defendants and would have been, and will be, effective without positing undue hardship to Defendants.

224.     Defendants' discriminatory actions and/or omissions are the proximate cause and cause in fact of Ms. Pike's injuries and an exacerbation of her mental illness and physical impairments, and Ms. Pike has suffered and will continue to suffer damage.

225.     Thus, Defendants have violated Ms. Pike's rights under the Rehabilitation Act, 29 U.S.C. § 794.

## **REQUESTS FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant her the following relief:

a.     A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Eighth Amendment prohibition on cruel and unusual punishment;

b.     A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Fourteenth Amendment right to due process.

c.     A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Fourteenth Amendment right to equal protection;

50

d.      A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the First and Fourteenth Amendment right to access the courts;

e.      A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Right to Counsel Under 18 U.S.C. § 3599;

f.      A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Religious Land Use and Institutionalized Persons Act;

g.      A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Americans with Disabilities Act;

h.      A declaration that Defendants' policies and practices of committing Plaintiff to prolonged and indefinite solitary confinement under the conditions set forth in this Complaint violate the Rehabilitation Act;

i.      Injunctive relief ordering Defendants to grant an exemption for Ms. Pike from the Mandatory Segregation Policy in light of the unconstitutionality and unlawfulness of such policy as applied to Ms. Pike;

j.      Injunctive relief ordering Defendants to grant Ms. Pike contact visits with counsel and their agents that are confidential and during which Ms. Pike is able to move freely in aid of her legal actions;

k.      Injunctive relief ordering Defendants to grant Ms. Pike contact visits with family members, spiritual advisors, and other personal visitors during which Ms. Pike is able to freely have physical contact with visitors;

l.      Injunctive relief ordering Defendants to grant Ms. Pike confidential, contact, face-to-face mental health treatment;

m.      Injunctive relief ordering Defendants to present a plan to the Court within 30 days of the issuance of the Court's order otherwise providing for:

i.      Alleviation of the conditions of Plaintiff's confinement so that Plaintiff is no longer incarcerated under conditions of isolation, sensory deprivation, environmental deprivation, and lack of social and physical human contact, in a way that is designed to successfully reintegrate Ms. Pike into living and social conditions in which she is among other incarcerated individuals;

ii.      Meaningful review and rights to appeal decisions regarding the continued need for Plaintiff's solitary confinement and meaningful review of Plaintiff's confinement level in the future; and

iii.      Adequate medical care to the Plaintiff to provide relief from her cognitive, mental, and psychological conditions that she already possessed and which have been exacerbated by his solitary confinement, including but not limited to cognitive therapy;

n.      The costs of this suit and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

o.      Retention of jurisdiction of this case for the remainder of Ms. Pike's life in the custody of TDOC; and

p.      Such other and further relief as the Court deems just and proper.

52

Dated: August 15, 2022

Respectfully submitted,

/s/ Brian D. Roark
Brian D. Roark (BPR 020262)
Angela L. Bergman (BPR 031981)
Hannah E. Webber (BPR 036244)
BASS, BERRY & SIMS PLC
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Telephone (615) 742-6200
Facsimile (615) 742-6293

*Attorneys for Plaintiff Christa Pike*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served upon the

following via the Court's CM/ECF e-mail notification system, on this the 15th day of August,

2022:

Dean Atyia
Tennessee Attorney General's Office
500 Martin Luther King Jr. Blvd.
Nashville, TN 37243
615-741-1982
Email: dean.atyia@ag.tn.gov

*Attorney for Defendants*

*/s/ Brian D. Roark*