# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:22-cv-00537** |
| | ) | |
| **LISA HELTON, et al.,** | ) | **District Judge Campbell** |
| | ) | |
| **Defendants.** | ) | **Magistrate Judge Newbern** |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION TO DISMISS

---

Plaintiff's complaint asks this court to intervene in the administration of a Tennessee prison for the purpose of granting the State's lone female death-row inmate—an inmate who tortured and murdered her victim; who, while incarcerated, attempted to kill a fellow inmate and vowed to finish the job; and who participated in an escape plot—special exceptions to Tennessee Department of Correction ("TDOC") policies applicable across all prisons and to death row inmates specifically. Although Plaintiff alleges a litany of past wrongs and generalized aspirations about her conditions of confinement, she fails to identify specific ongoing deprivations of constitutional rights which would entitle her to relief. Accordingly, the Complaint should be dismissed in its entirety.

1

# BACKGROUND

## A.      Plaintiff's Conviction and Incarceration

On January 11, 1995, Plaintiff, a student at the Job Corps Center in Knoxville, threatened to kill fellow student, Colleen Slemmer, "because she had just felt mean that day." *State v. Pike*, 978 S.W.2d 904, 908 (Tenn. 1998).[1] The following day, Plaintiff followed through with her threat. *Id*.

Plaintiff, who was carrying a box cutter and a miniature meat cleaver, lured Slemmer away to an isolated area with two accomplices. *Id*. at 909. Once there, Plaintiff banged Slemmer's head on her knee, threw her to the ground, and kicked her repeatedly. *Id*. When Slemmer tried to run, one accomplice stopped her and held her down while Plaintiff cut Slemmer's stomach with the box cutter. *Id*. Plaintiff sat "looking at Slemmer and 'just watching her bleed'" until Slemmer tried to run away again, and Plaintiff slashed Slemmer across the back. *Id*. As Slemmer begged for her life, Plaintiff repeatedly kicked Slemmer in the face. *Id*.

After walking around to make sure no one could see her, Plaintiff sliced Slemmer's throat several times while she cried for mercy, shoving Slemmer down each time she tried to get up. *Id*. Plaintiff and an accomplice forced Slemmer to remove her blouse and bra to keep her from running away. *Id*. at 910. When Slemmer made yet another attempt to flee, Plaintiff smashed the back of Slemmer's head with a large chunk of asphalt. *Id*. at 908, 910. At some point, Plaintiff and an accomplice carved a pentagram into Slemmer's chest. *Id*. at 909.

Later that night, Plaintiff recounted her torture and murder of Slemmer to a friend while "dancing in a circle, smiling, and singing 'la, la, la.'" *Id*. at 908. Plaintiff displayed a piece of

---

[1] Federal courts may consider matters of public record, including the records of other courts of record, when deciding a motion to dismiss. *McLaughlin v. CNX Gas Co., LLC*, 639 Fed. App'x 296, 298 (6th Cir. 2016); *Lyons v. Stovall*, 188 F.3d 327, 332 n.3 (6th Cir. 1999).

Slemmer's skull, which she had kept "as a souvenir," to multiple witnesses. *Id*. at 908, 911-12. At breakfast the morning after the murder, Plaintiff told the same friend that the piece of Slemmer's skull was still in her pocket and said, "'[a]nd, yes, I'm eating breakfast with it.'" *Id*.

The next day, an employee of the University of Tennessee located Slemmer's "semi-nude, slashed, and badly beaten body." *Id*. at 908. He explained that the body was so badly beaten, he first mistook it for the corpse of an animal. *Id*.

The medical examiner could not catalog the innumerable "superficial slash wounds on Slemmer's back, arms and chest;" but she was able to catalog eleven slash wounds on Slemmer's throat, at least four blows to her head, a pentagram carved into her chest, bruising on her knees consistent with crawling, and defensive wounds on her right arm. *Id*. at 910-11. Slemmer was alive and conscious while Plaintiff beat and cut her "'for about thirty minutes to an hour.'" *Id*. at 910-11.

A Knox County jury convicted Plaintiff of premeditated first degree murder and conspiracy to commit first degree murder and sentenced her to death. *Id*. at 907; (D.E. 9, PageID# 105, 110 ¶¶ 1, 17.) Plaintiff is currently the only woman under a sentence of death in Tennessee. (D.E. 9, PageID# 110, ¶ 17.) State and federal courts have affirmed Plaintiff's conviction and sentence on direct appeal, post-conviction review, and federal habeas review. *Pike v. Gross*, 936 F.3d 372, 374-75 (6th Cir. 2019), *cert. denied* 141 S. Ct. 86 (June 8, 2020); *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *1 (Tenn. Crim. App. Apr. 25, 2011), *perm. app. denied* (Tenn. Nov. 15, 2011); *Pike*, 978 S.W.2d at 923; (D.E. 9, PageID# 110, ¶ 17.).

In 2012, Plaintiff was disciplined for attempting to escape. (D.E. 9, PageID# 114, ¶ 33.) However, Plaintiff's exploits in prison have not been limited to escape plans. A Davidson County jury convicted Plaintiff of the 2001 attempted premeditated first degree murder of a fellow inmate.

3

*State v. Pike*, No. M2005-00738-CCA-R3-CD, 2006 WL 547997, at *1 (Tenn. Crim. App. Mar. 6, 2006), *perm. app. denied* (Tenn. Aug. 21, 2006); (D.E. 9, PageID# 114, ¶ 33).[2]  Plaintiff and two other inmates were evacuated to a recreation cell for their own safety due to a fire on the segregation unit.  *Id*. at 1-2.  Plaintiff seized on this temporary change to her routine as an opportunity to kill.  She brought a boot lace with her when she evacuated her cell, and then used it to strangle another evacuated inmate.  *Id*. at *2, *4.  Plaintiff pulled the boot lace around the other inmate's neck until she fell, then flipped her victim onto her stomach, sat on her, and continued strangling her until officers could pull Plaintiff off.  *Id*. at *2.  Plaintiff told a correctional officer that "if she had been given thirty more seconds 'she would have killed the bitch.'"  *Id*.  Plaintiff also called her mother to recount how her victim "'was passed out on the ground, Mama, twitching, foaming at the mouth, her eyeballs were bugged out so far, her eyelids were flipped up.'"  *Id*. at *3.  She promised her mother that "I'm gonna do it again!  I'm gonna succeed this damn time!" and lamented, "'If I'd of had thirty more seconds, I'd, we'd have a little chalk line out there in our rec pen, and that bitch would be gone somewhere.'"  *Id*.  Plaintiff admitted to multiple people that she premeditated the strangling.  *Id*. at *3.  Plaintiff also admits to other disciplinary infractions and attempts to take her own life.  (D.E. 9, PageID# 114, 130, ¶¶ 31, 96.)

## B.  TDOC's Policies and Procedures

### 1.  Mandatory Segregation for Capital Inmates

Inmates who are sentenced to death are assigned to "mandatory segregation."  (TDOC Pol. & Proc. 404.11(V),[3] Exhibit 1, at 1; D.E. 9, PageID# 115, ¶ 38.)  "Mandatory Segregation" is

---

[2] *See* footnote 1*, supra*.

[3] The attached TDOC Policies and Procedures are, with the exception of Exhibits 3 and 9, public records available online.  *See Policies and Procedures*, Tennessee Department of Correction, https://www.tn.gov/correction/about-us/policies-and-procedures.html (last accessed September 14, 2022).  This Court can properly consider public records when reviewing Defendants' motion

"[a]ssignment to maximum security housing of those inmates committed to the Department under the sentence of death." (TDOC Pol. & Proc. 404.11(IV)(A), Exhibit 1, at 1.) A capital inmates' custody status is reviewed every seven days for the first 60 days after arrival and every 30 days thereafter on a variety of factors including, at a minimum: disciplinary record, criminal activity in prison, record of violent reactions to stressful situations, adjustment to unit activities, willingness and ability to live harmoniously with among others, attitude towards authority, personal hygiene, incompatibility with other inmates, and participation in daily cell inspection. (TDOC Pol. & Proc. 404.11(VI)(B), Exhibit 1, at 2.)

Segregated inmates are separated by their cells from each other and general population inmates. (TDOC Pol. & Proc. 506.16(VI)(A)(1), Exhibit 2, at 2.) Segregated inmates receive access to medical staff and prescribed medication daily; opportunity to bathe three times weekly; meals of the same content as the general population, unless behavior requires service of finger foods; daily outdoor exercise periods, unless behavior makes exercise dangerous; bedding and linens of like kind and quality as the general population; and laundry services commensurate with that provided the general population. (TDOC Pol. & Proc. 506.16(VI)(B), Exhibit 2, at 3-6.) When inclement weather or other circumstances preclude outdoor exercise, segregated inmates receive one hour in a secure hallway or day-room. (TDOC Pol. & Proc. 506.16(VI)(B)(4)(b)(2), Exhibit 2, at 6.) Segregated inmates may be given job assignments at the discretion of the Warden. (TDOC Pol. & Proc. 506.16(VI)(E)(9), Exhibit 2, at 9.) Capital inmates still have their custody-level classification reviewed annually so that, if their sentence of death is vacated, they can be

---

to dismiss. *Kassem v. Ocwen Loan Servicing, LLC*, 704 Fed. App'x 429, 432 (6th Cir. 2017) (approving consideration of assignments held by a county register of deeds on a motion to dismiss).

moved to the appropriate custody level or facility.  (TDOC Pol. & Proc. 404.11(VI)(A)(8), Exhibit 1, at 2.)

## 2.    Program Levels for Capital Inmates

Inmates in mandatory segregation under a sentence of death are assigned to one of three program levels determining their work and programmatic activities.  (TDOC Pol. & Proc. 503.03, Exhibit 3;[4] D.E. 9, PageID# 116, ¶ 41.)   Inmates start at Level C.   (TDOC Pol. & Proc. 503.03(VI)(A), Exhibit 3, at 1; D.E. 113, PageID# 12, ¶ 43.)  Level B and C inmates are eligible for advancement to the next level every six months, except that inmates received at an institution must remain on Level C for 12 months prior to consideration for Level B.  (TDOC Pol. & Proc. 503.03(VI)(D)(1), 503.03(VI)(K)(1), Exhibit 3, at 2, 4.)  Inmates have the opportunity to present information to the unit review panel for consideration of their level assignment.  (TDOC Pol. & Proc. 503.03(VI)(E), Exhibit 3, at 2.)  When reviewing an inmate for a program-level assignment, the panel considers, among other things, the inmate's:

1.  disciplinary record,
2.  past criminal record,
3.  past record of incarceration,
4.  criminal activity in prison or jail,
5.  record of violent reactions to stressful situations,
6.  institutional record on work/education assignment,
7.  adjustment to unit activities,
8.  willingness and ability to live harmoniously among others,
9.  incompatibility with other inmates,
10. attitude toward authority,
11. personal hygiene,

---

[4] Exhibits 3 and 9, the TDOC Program Level Policy and Procedures and the Memorandum outlining Plaintiff's specific privileges and restrictions, are integral to Plaintiff's claims and are referred to repeatedly in the First Amended Complaint.  (D.E. 9, PageID# 108-09, 111, 115-121, 123-27, 130, 137-38, 140-41, 145-46, 150, 153, ¶¶ 9, 12, 20, 40-47, 51-54, 56-59, 70, 73, 77-78, 83-84, 89, 98, 124, 126, 129, 138-39, 144-45, 164-66, 170, 198, 215.)  Accordingly, this Court may consider this Policy in deciding Defendants' motion to dismiss.  *See Gardner v. Quicken Loans, Inc.*, 567 Fed. App'x 362, 364-65 (6th Cir. 2014) (collecting cases and approving consideration of "documents relating [to] the note, mortgage, assignment, loan modification process, and foreclosure that are referenced in the complaint and integral" to the claims).

12. involvement with Security Threat Group activities,
13. psychological, psychiatric, and/or other behavior health or medical evaluations completed within the past six months as provided by the institutional medical staff, and
14. other information or special consideration that may reflect on the appropriateness of the level placement.

(TDOC Pol. & Proc. 503.03(VI)(I), Exhibit 3, at 3.)

In addition to the regular review schedule, an inmate may be demoted one or two levels for disciplinary infractions.  (TDOC Pol. & Proc. 503.03(VI)(M), Exhibit 3, at 6.)  Eligibility for a level increase after a disciplinary infraction varies depending on the inmate's current level and severity of the infraction.  (TDOC Pol. & Proc. 503.03(VI)(M), Exhibit 3, at 6.)  Inmates at Level A "must maintain an overall exceptional rating in the unit and remain free from disciplinary convictions."  (TDOC Pol. & Proc. 503.03(VI)(K)(3), Exhibit 3, at 5.)

Death row inmates enjoy more privileges as they advance program levels.  (*See generally* TDOC Pol. & Proc. 503.03(VI)(K), Exhibit 3, at 4-6; D.E. 9, PageID# 117, ¶ 43.)  At Levels A and B, inmates may be able to participate in group activities with other inmates under a sentence of death.  (TDOC Pol. & Proc. 503.03(VI)(K)(2) – (3), Exhibit 3, at 4-6.)

### 3.     Access to Attorneys

For all inmates, attorneys—including any person working for, on behalf of, or under the direction of an attorney—are permitted to visit their clients during regular hours after advance contact with the Warden to approve and facilitate the visit.  (TDOC Pol. & Proc. 105.09(VI)(A), Exhibit 4, at 1.)  The Warden may deny access if (1) an attorney's identity cannot be satisfactorily verified, (2) access would pose a threat to the safety and security of the facility, or (3) access would unduly disrupt the orderly management and operation of the facility.  (TDOC Pol. & Proc. 105.09(VI)(C), Exhibit 4, at 1.)  The Warden also must make reasonable attempts to provide access outside regular hours in emergency situations.  (TDOC Pol. & Proc. 105.09(VI)(B), Exhibit 4, at

1.) All attorneys who enter any institution are subject to routine visitor search procedures. (TDOC Pol. & Proc. 105.09(VI)(F), Exhibit 4, at 2.) While papers and briefcases may be searched for contraband, no papers are read or reviewed. (TDOC Pol. & Proc. 105.09(VI)(F), Exhibit 4, at 2.) Meetings between attorneys and inmates are confidential, but inmates must be maintained under visual supervision. (TDOC Pol. & Proc. 105.09(VI)(G), Exhibit 4, at 2.)

### 4. Access to Religious Advisors

Inmates may receive visits from religious volunteers and outside clergy. (TDOC Pol. & Proc. 118.01(IV)(B)(2)(a), Exhibit 5, at 3.) Religious volunteers must complete screening, training, orientation, and reference and background checks. (TDOC Pol. & Proc. 118.01(IV)(B)(2)(k), Exhibit 5, at 4.) Inmates must submit requests for individual religious accommodations in writing for review by the Chaplain and Warden. (TDOC Pol. & Proc. 118.01(IV)(E)(1)(a), Exhibit 5, at 9.)

### 5. Inmate Mail

All mail addressed to any inmate is delivered to the mail room, opened, and inspected for contraband. (TDOC Pol. & Proc. 507.02(VI)(B), 507.02(VI)(C)(1), Exhibit 6, at 2, 4.) Privileged mail—mail clearly addressed to or from attorneys—is only opened in the presence of the inmate addressee. (TDOC Pol. & Proc. 507.02(IV)(N), 507.02(VI)(C)(1), Exhibit 6, at 2, 4.) While non-privileged mail may be read, privileged mail is not read unless the Warden has reasonable suspicion to believe that the privileged mail contains information relating to criminal activity. (TDOC Pol. & Proc. 507.02(VI)(B)(1), 507.02(VI)(C)(1), Exhibit 6, at 2, 4.)

No correspondence, printed material, inmate personal property, or money may be hand delivered by a visitor to any inmate. (TDOC Pol. & Proc. 507.02(VI)(B)(6), Exhibit 6, at 3.) The Warden or her designee may permit attorneys of record to deliver privileged mail directly to an

inmate only after it has been examined for contraband.  (TDOC Pol. & Proc. 507.02(VI)(B)(6), Exhibit 6, at 3.)

### 6.    Visitation

Generally, inmates may have visitation with all immediate family members and up to eight additional adults, all of whom must complete an application and be approved.  (TDOC Pol. & Proc. 507.01(VI)(B)(6)(a), Exhibit 7, at 3.)  Death row inmates on Level C may have non-contact visits twice per week for up to one hour.  (TDOC Pol. & Proc. 503.03(VI)(K)(1)(f), Exhibit 3, at 4.)  At Level B, inmates may have visits twice per week for a total of three hours, either contact or non-contact, at the discretion of the Associate Warden of Security.  (TDOC Pol. & Proc. 503.03(VI)(K)(2)(b), Exhibit 3, at 5.)  At Level A, inmates are granted contact visits twice per week for a total of three hours or more, depending on space availability.  (TDOC Pol. & Proc. 503.03(VI)(K)(3)(c), Exhibit 3, at 5.)  Non-contact visitation involves visual and auditory communication without physical contact.  (TDOC Pol. & Proc. 507.01.1(IV)(A), Exhibit 8, at 1.)  Non-contact visitation may be imposed for inmates in segregation.  (TDOC Pol. & Proc. 507.01.1(VI)(A)(7), Exhibit 8, at 2.)

### C.    Plaintiff's Current Conditions of Confinement

Plaintiff advanced to Level A less than a month before filing her complaint.  (D.E. 9, PageID# 120, ¶ 57.)  She has been given a detailed schedule to support the mandatory segregation policy and her Level A classification. (Memorandum to Unit 3 Staff, Exhibit 9, at 1.)[5]  To maintain segregation and security, Plaintiff is not allowed to (1) enter other cells in her unit, (2) pass through the pod exit door, (3) go upstairs, or (4) exit the multipurpose room to another pod.  (Memorandum to Unit 3 Staff, Exhibit 9, at 1.)  She may enter the multipurpose room or the stairwell with an

---

[5] As explained in Note 4, *supra*, the Memorandum outlining Plaintiff's current program level is properly considered on Defendants' motion to dismiss.

escort.  (Memorandum to Unit 3 Staff, Exhibit 9, at 1.)  Plaintiff is scheduled for two hours of exercise, free of restraints, in a secure recreation area between 7:30 and 10:00 a.m. Monday through Friday.  (Memorandum to Unit 3 Staff, Exhibit 9, at 1; D.E. 9, PageID# 123, ¶ 68.) Plaintiff also can work as a dorm aide for four hours per day, in two two-hour shifts, Monday through Friday.  (Memorandum to Unit 3 Staff, Exhibit 9, at 1-2; D.E. 9, PageID# 123-124, ¶ 70-71.)  Plaintiff may work on arts and crafts projects in her cell and for an hour in the multipurpose room once a week.  (Memorandum to Unit 3 Staff, Exhibit 9, at 2.)  Plaintiff receives individual counseling twice per week for an hour.  (Memorandum to Unit 3 Staff, Exhibit 9, at 2.)  She also has access to a spiritual advisor.  (D.E. 9, PageID# 126, ¶ 79.)  She may have contact visits with immediate family and attorneys and non-contact visits with other visitors, scheduled in accordance with the visitation policy and procedures.  (Memorandum to Unit 3 Staff, Exhibit 9, at 2; D.E. 9, PageID# 125-126, ¶ 78.)  An officer must remain in the visiting area during visits with family, but no TDOC employee is inside the room during a legal visit.  (Memorandum to Unit 3 Staff, Exhibit 9, at 2.)  Plaintiff may also schedule visits with a law clerk upon request up to one hour per day. (Memorandum to Unit 3 Staff, Exhibit 9, at 2.)  Plaintiff has access to a television, a handheld radio, and reading materials while she is in her cell.  (D.E. 9, PageID# 123, ¶ 66.)

## STANDARD OF REVIEW

When considering a motion to dismiss a complaint pursuant to Fed. R. Civ. P. 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept [the plaintiff's] allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Wesley v. Campbell*, 779 F.3d 421, 428 (6th Cir. 2015) (quoting *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir.2007)).  "However, 'a legal conclusion couched as a factual allegation' need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action

sufficient." *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010) (quoting *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir.2009)).

To survive a Rule 12(b)(6) motion to dismiss, the complaint must raise more than a "possibility that a defendant has acted unlawfully"; there must be sufficient factual allegations to render the claim facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Wesley*, 779 F.3d at 429. A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. In the context of a motion to dismiss a claim brought under 42 U.S.C. § 1983, "the plaintiff must allege two elements: 1) the defendant acted under color of state law; and 2) the defendant's conduct deprived the plaintiff of rights secured under federal law." *Fritz*, 592 F.3d at 722.

When an inmate asks a federal court to intervene in prison administration, prison officials enjoy a deferential standard of review. "The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief" requested by an inmate. 18 U.S.C. § 3626(a)(1). The Supreme Court has repeatedly recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987) (quoting *Procunier v. Martinez*, 416 U.S. 396, at 405) (internal quotations omitted). Because "'the realities of running a penal institution are complex and difficult' prison officials are afforded 'wide-ranging deference' in their decisions regarding prison administration and regulation." *Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (*quoting Jones v. N.C. Prisoners' Lab. Union, Inc.*, 433 U.S. 119, 126 (1977). "Subjecting prison officials' decisions to close scrutiny 'distort[s] the decisionmaking process' and 'seriously hamper[s] [officials'] ability to . . . adopt innovative solutions to the intractable problems of prison

administration.'" *Klinger v. Dep't of Corr.*, 31 F.3d 727, 732 (8th Cir. 1994) (quoting *Turner*, 482 U.S. at 89). Consequently, courts "will not intervene in internal prison operations without an urgently compelling and extraordinary reason." *Smith v. Baugh*, No. 3:05-0860, 2007 WL 1080137, at *2 (M.D. Tenn. April 9, 2007).

And § 1983 does not offer an inmate a vehicle to have all of her past complaints with prison administration settled in a declaratory judgment. To maintain an action against a state official in her official capacity under § 1983, an inmate must seek prospective injunctive relief to restrain a continuing constitutional violation. *Ex Parte Young*, 209 U.S. 123, 159-60. An inmate's past exposure to allegedly illegal conduct "does not in itself show a present case or controversy regarding injunctive relief." *O'Shea v. Littleton*, 414 U.S. 488, 495 (1974). Plaintiff must show that there is "a real and immediate threat that [s]he will suffer a future injury due to the alleged wrongdoing" in violation of her Eighth Amendment rights to have standing to seek prospective injunctive relief. *Burford v. Troutt*, No. 3:11-0115, 2011 WL 5826637, at *3 (M.D. Tenn. Nov. 18, 2011). Declaratory judgment is not available as a substantive remedy for past violations of federal law, as a grant of such relief is outside the scope of the prospective relief contemplated by *Ex Parte Yong* and is barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 73 (1985). "Notice relief" regarding past events is permitted only when it does not implicate Eleventh Amendment sovereign immunity because the relief sought is ancillary to the case or controversy at issue. *See Quern v. Jordan*, 440 U.S. 332, 349 (1979).

"Under a well-established exception to Rule 12(d), courts may consider documents attached to a Rule 12(b)(6) or 12(c) motion without converting either into a summary-judgment motion if the attached materials are: (i) 'referred to in the plaintiff's complaint and are central to [the] claims' or (ii) 'matters of public record.'" *Kassem v. Ocwen Loan Servicing, LLC*, 704

Fed.Appx. 429, 432 (6th Cir. 2017) (quoting *McLaughlin v. CNX Gas Co., LLC*, 639 Fed.Appx. 296, 298–99 (6th Cir. 2016) and citing *Greenberg v. Life Ins. Co. of Va.*, 177 F.3d 507, 514 (6th Cir. 1999). In deciding whether to take judicial notice of such materials under Rule of Evidence 201, Courts may weigh the declared source of the proffered materials against "allegations that the [documents] were unauthentic, inaccurate, or otherwise unrepresentative of the public record" as "reasons that would give a district court pause before relying on such documents." *Kassem*, 704 F. App'x 429, 433 (6th Cir. 2017). !

## ARGUMENT

### I. Segregation of Death-Sentenced Inmates from the General Population Does Not Deny Plaintiff the Minimal Civilized Measure of Life's Necessities.

Plaintiff alleges that Defendants have subjected her to "unconstitutional solitary confinement" in violation of the Eighth Amendment prohibition of cruel and unusual punishment under 42 U.S.C. § 1983. But to label Plaintiff's privileges in prison as "solitary confinement" is inaccurate, and her treatment falls far shy of cruel and unusual punishment.

"The unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992). As to the conditions of an inmate's confinement, "only those deprivations denying 'the minimal civilized measure of life's necessities' are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.*, at 9 (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)); *see also Hadix v. Johnson*, 367 F.3d 513, 525 (6th Cir. 2004). These necessities are "reasonably adequate food, clothing, shelter, sanitation, recreation, and medical care." *Vick v. Core Civic*, 329 F.Supp.3d 426, 451 (M.D. Tenn. 2018) (citing *Grubbs v. Bradley*, 552 F.Supp. 1052, 1119-1124 (M.D. Tenn. 1982)).

Administrative segregation does not, in and of itself, constitute cruel and unusual punishment. *Hutto v. Finney*, 437 U.S. 678, 685 (1978). Instead, like all other conditions of confinement claims, a plaintiff must establish that the conditions of segregation themselves are cruel and unusual. *Id.*; *Coleman v. Governor of Michigan*, 413 Fed. App'x 866, 875 (6th Cir. 2011); *Adams v. Galloway*, No. 04-2605, 2006 WL 1645252, at *2 (W.D. Tenn. June 8, 2006). Making out a prima facie case involves both a subjective and objective component: the court must determine if the "alleged wrongdoing was objectively harmful enough to establish a constitutional violation" and if prison officials acted with "a sufficiently culpable state of mind." *Hudson*, 503 U.S. at 8 (quoting *Wilson v. Seiter*, 501 U.S. at 298). The objective component requires a showing of extreme deprivation: as noted above, only deprivations denying "the minimal civilized measure of life's necessities" are sufficiently grave to violate the Eighth Amendment. *Hudson*, 503 U.S. at 9 (quoting *Wilson v. Seiter*, 501 U.S. at 298) (quotation marks omitted). The subjective component requires that the plaintiff show that the defendant acted with deliberate indifference to the plaintiff's health or safety. *Wilson v. Seiter*, 501 U.S. at 302-303.

Plaintiff fails to state a claim because she does not allege she has been denied reasonably adequate food, clothing, shelter, sanitation, recreation, or medical care. Instead of the extreme deprivation of basic necessities characteristic of cruelty, Plaintiff's allegations center on the breadth of her social interactions and her preferred standard of living. She complains that the mandatory segregation policy "prevent[s] her from having meaningful interactions with other individuals including DJRC officials and other staff working within DJRC, her legal counsel, her spiritual advisors, and other personal visitors including her family." (D.E. 9, at PageID# 141, ¶ 144.) Yet she acknowledges that she has recently been moved to Level A (D.E. 9, at PageID# 120, ¶ 57), which comes with the privileges of contact visits with family and attorneys. (D.E. 9, at

14

PageID# 125, ¶ 78.) Still, she would prefer to have an "opportunity to establish long-term or meaningful relationships." (D.E. 9, at PageID# 122, ¶ 64.) However, as many courts have recognized, an inmate's freedom to engage in relationships that may be normal for free citizens is naturally, and constitutionally, curtailed by the demands of prison administration. *See Overton v. Bazzetta*, 539 U.S. 126, 131 (2003) ("[F]reedom of association is among the rights least compatible with incarceration."); *White v. Keller*, 438 F. Supp. 110, 117 (D. Md. 1977) ("freedom of physical association is inconsistent with an incarcerative penal system"), *aff'd*, 588 F.2d 913 (4th Cir. 1978); *see also Fennell v. Carlson*, 466 F. Supp. 56, 59 (W.D. Okla. 1978); *Von Minden v. Jankowski*, No. A-06-CA-823 LY, 2007 WL 1958615, at *7, n. 8 (W.D. Tex. July 3, 2007), *aff'd*, 268 F. App'x 352 (5th Cir. 2008); *Desper v. Clarke*, No. 7:17-CV-00549, 2019 WL 360527, at *3 (W.D. Va. Jan. 29, 2019), aff'd, 1 F.4th 236 (4th Cir. 2021) (all citing to *White v. Keller* for the proposition).

Nowhere does Plaintiff allege that she resides in "[a] filthy, overcrowded cell" or that she is served "a diet of 'grue.'" *Hutto*, 437 U.S. at 686-87 (suggesting that even these conditions "might be tolerable for a few days"). Rather, Plaintiff complains that her cell door is too thick, such that she cannot talk to inmates in nearby cells and that sounds in her pod are muffled. (D.E. 9, at PageID# 122, ¶ 62.) Plaintiff admits that she is provided a television, a radio, reading materials, and arts and crafts for mental stimulation—but these she finds insufficient. (D.E. 9, at PageID# 122, ¶ 66.) Plaintiff also has a job, which she likes, that gets her out of her cell four hours per weekday, in addition to any visitation or legal appointments. (Memorandum to Unit 3 Staff, Exhibit 9, at 1-2; D.E. 9, PageID# 123-24, ¶ 70-71.) These conditions far exceed the minimum conditions required by the Sixth Circuit, which has specifically affirmed extended confinement for twenty-three hours per day. *Argue v. Hofmeyer*, No. 03-1156, 80 Fed Appx. 427, 428-29, 2003 WL 22495834, at *2 (6th Cir. Oct. 30, 2003).

Plaintiff admits that she previously received one hour per weekday for recreation. (D.E. 9, at PageID# 123, ¶ 67-68.) And under her new Level A program, she receives two hours per weekday for recreation. (Memorandum to Unit 3 Staff, Exhibit 9, at 1; D.E. 9, PageID# 123, ¶ 68.) The ten hours per week she receives is double the amount of time that a court in this district and the Sixth Circuit have suggested is the constitutional minimum. *Vick*, 329 F.Supp.3d at 452 (citing *Rodgers v. Jabe*, 43 F.3d 1082, 1087–1088 (6th Cir. 1995)).

Plaintiff does at least attempt to allege a deprivation of medical care. She claims that, during her more than twenty-five years in prison, she has deteriorated mentally and physically. (D.E. 9, PageID# 128-30, ¶¶ 91-97.) And she alleges that access to medical care and mental health professionals has been delayed or denied. (D.E. 9, PageID# 130, ¶ 97.) But, despite these generalized allegations, the complaint fails to identify specific instances of denied medical care or specific deficiencies in TDOC's current policies that result in an active deprivation of medical care. The PLRA does not permit a prisoner to proceed on generalized allegations of past violations, seeking declaratory relief for an unspecified improvement in future conditions. *Green v. Mansour*, 474 U.S. at 73. Instead, Plaintiff must identify specific deprivations that violate the Eighth Amendment and can be corrected by a prospective injunction. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (requiring particularized allegations of an injury in fact caused by government action and likelihood that prospective relief would correct the alleged injury in order to justify injunction); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). Plaintiff's generalized allegations about medical care lack the requisite specificity to state a claim.

Plaintiff's allegations are clear: she is not being deprived of any recognized necessities: she has adequate food, clothing, shelter, sanitation, recreation, and medical care. *Vick*, 329 F.Supp.3d at 451; *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981). Rather, Plaintiff is asking this

16

Court to import her own wide-ranging desires—socialization, interaction, physical contact, environmental and sensory stimulation, and "meaningful activity"—into the Eighth Amendment. (D.E. 9, PageID# 141-42, ¶¶ 145-46.) Plaintiff's conditions are a far cry from a filthy, overcrowded cell and a diet of grue—she has access to medical staff and prescribed medication, on a daily basis, the opportunity to bathe three times weekly, meals of the same content as the general population, two hours of exercise, Monday through Friday, a job as a dorm aide for four hours per day, Monday through Friday, access to a multipurpose room for one hour per week, access to counseling twice per week for an hour at a time, access to a law clerk for up to one hour per day, contact visits with a spiritual advisor, family, and legal counsel as required, and a television, handheld radio, reading materials, and small arts and crafts in her cell. (TDOC Pol. & Proc. 506.16(VI)(B), Exhibit 2, at 3-6; Memorandum to Unit 3 Staff, Exhibit 9, at 1-2; D.E. 9, PageID# 123-26, ¶ 66, 68, 70-71, 78-79); *cf. Vick*, 329 F.Supp.3d at 451; *Sheley v. Dugger*, 833 F.2d 1420, at 1428-29 (11th Cir. 1987). In total, Plaintiff has the opportunity to spend, at a minimum, thirty-eight hours per week outside of her cell. (TDOC Pol. & Proc. 506.16(VI)(B), Exhibit 2, at 3-6; Memorandum to Unit 3 Staff, Exhibit 9, at 1-2; D.E. 9, PageID# 123-26, ¶ 66, 68, 70-71, 78-79).

Courts "will not intervene in internal prison operations without an urgently compelling and extraordinary reason." *Smith v. Baugh*, 2007 WL 1080137, at *2. Prison officials have the authority to effect the segregation of inmates when the safety and security of inmates and the institution so requires. *Canterino v. Wilson*, 869 F.2d 948, 953 (6th Cir. 1989) (citing *Enomoto v. Wright*, 434 U.S. 1052 (1978) and *Bills v. Henderson*, 631 F.2d 1287 (6th Cir. 1980)). The Sixth Circuit has specifically affirmed a district court's dismissal of an Eighth Amendment claim on the basis that extended confinement for "twenty-three hours per day, Monday through Friday, does

not rise to the level of a constitutional magnitude, because the confinement does not impose an atypical and significant hardship." *Argue*, 80 Fed Appx. at 428-29, 2003 WL 22495834, at *2. The conditions of Plaintiff's confinement offer significantly more freedom than this high threshold, and do not rise to the level of an extreme deprivation required to state a claim for a violation of the Eighth Amendment.

## II.    TDOC's Policies Are Applied Equally to All Death Row Inmates.

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "It is in essence 'a direction that all persons similarly situated should be treated alike.'" *Robinson v. Jackson*, 615 F. App'x 310, 314 (6th Cir. 2015) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). To survive a motion to dismiss, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotations omitted).

Plaintiff has failed to meet this fundamental pleading requirement. Plaintiff appears to offer two theories in support of her equal protection claim: (1) that she is treated disparately from similarly situated male death row inmates (D.E. 9, PageID# 145-146, ¶¶ 162-65, 167), and (2) that she is in a class of one and arbitrarily treated disparately from "[o]ther individuals sentenced to

18

not rise to the level of a constitutional magnitude, because the confinement does not impose an atypical and significant hardship." *Argue*, 80 Fed Appx. at 428-29, 2003 WL 22495834, at *2. The conditions of Plaintiff's confinement offer significantly more freedom than this high threshold, and do not rise to the level of an extreme deprivation required to state a claim for a violation of the Eighth Amendment.

## II.    TDOC's Policies Are Applied Equally to All Death Row Inmates.

Under the Equal Protection Clause of the Fourteenth Amendment, no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "It is in essence 'a direction that all persons similarly situated should be treated alike.'" *Robinson v. Jackson*, 615 F. App'x 310, 314 (6th Cir. 2015) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

"The threshold element of an equal protection claim is disparate treatment; once disparate treatment is shown, the equal protection analysis to be applied is determined by the classification used by government decision-makers." *Scarborough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). To survive a motion to dismiss, "a plaintiff must adequately plead that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (internal quotations omitted).

Plaintiff has failed to meet this fundamental pleading requirement. Plaintiff appears to offer two theories in support of her equal protection claim: (1) that she is treated disparately from similarly situated male death row inmates (D.E. 9, PageID# 145-146, ¶¶ 162-65, 167), and (2) that she is in a class of one and arbitrarily treated disparately from "[o]ther individuals sentenced to

18

death" (D.E. 9, PageID# 145-146, ¶ 166). Neither theory is supported by allegations identifying an individual who is similarly situated that has been treated disparately.

### A. Male and female death row inmates are not treated disparately.

First, Plaintiff has not alleged how female death row inmates are being treated disparately from male death row inmates. TDOC policies, including mandatory segregation and the level system, apply to female death row inmates at DJRC with equal force as to male death row inmates at Riverbend.[6] Plaintiff admits as much, but she claims that the equal application of TDOC's policies "*result* in effective solitary confinement" for her in a way it does not for men. (D.E. 9, PageID# 145, ¶ 163.) In other words, Plaintiff's theory is that Defendant's even-handed application of TDOC policies has a disparate impact on her as the only female death row inmate.

Plaintiff's disparate impact theory does not state a claim under the Equal Protection Clause. "[M]ere disparate impact is insufficient to demonstrate an equal protection violation." *Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995); *see Personnel Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279-80 (1979) (holding the Equal Protection Clause is not violated even when a legislature is aware that a law has an adverse effect upon women, so long as the law was not adopted "because of" that effect). "[A] § 1983 claim cannot be based on a disparate impact analysis because proof of discriminatory intent is required." *Jachyra v. Southfield*, 97 F.3d 1452 (Table), 1996 WL 520795, at *4 (6th Cir. 1996) (citing *Washington v. Davis*, 426 U.S. 229, 244-

---

[6] Some courts have refused to treat inmates at men's and women's prisons as similarly situated, recognizing that limited funding and calibration of programming means "female inmates can always point out certain ways in which male prisons are 'better' than theirs, just as male inmates can always point out *other* ways in which female prisons are 'better' than theirs." *Klinger v. Department of Corrections*, 31 F.3d 727, 732 (8th Cir. 1994). Here, though, Plaintiff has not even pointed out ways in which Riverbend is "better" than DJRC, except that it houses more inmates. As explained below, housing male and female death row inmates in gender-appropriate facilities does not violate the Equal Protection Clause.

19

45 (1976)). While disparate impact may be considered as proof in support of a disparate treatment case, "it is not sufficient alone to state a claim under § 1983." *Id*.

The Complaint fails to identify any disparate treatment of male and female death row inmates that would support an Equal Protection Clause claim. Instead, Plaintiff resorts to repeating the conclusory allegation that women receive disparate treatment and mischaracterizing TDOC's even-handed application of the mandatory segregation policy as "solitary confinement." (D.E. 9, PageID# 108-109, 119, 146 ¶¶ 10, 51, 167.) These vague and conclusory allegations of unequal opportunities are insufficient to sustain a prima facie case of gender-based discrimination. *Canterino v. Wilson*, 869 F.2d 948, 954 (6th Cir. 1989). Both men and women are subject to mandatory segregation, the level system, and other TDOC policies as a result of their sentence of death.

The only disparate *treatment* of male and female inmates identified by the Complaint is that female inmates are housed at DJRC and not at Riverbend. (D.E. 9, PageID# 119, 140, 145, ¶¶ 51, 139, 162.) But that one difference cannot sustain an Equal Protection Clause claim. There is no doubting TDOC's compelling interest in separating male and female death row inmates. *Lothes v. Butler County Juvenile Rehabilitation Center*, 243 F. App'x 950, 956 (6th Cir. 2007) ("Segregation of inmates by sex is unquestionably constitutional."); *see Everson v. Mich. Dept. of Corrections*, 391 F.3d 737, 753-54 (6th Cir. 2004) (holding prison could refuse to hire male staff in female prison because doing so would create barriers to security, create opportunity for sexual abuse, and increase hesitancy in discipline). And Defendants cannot be blamed for a scarcity of women sentenced by juries to death. *See Women Prisoners of District of Columbia Dept. of Corrections v. District of Columbia*, 93 F.3d 910, 926 (D.C. Cir. 1996) (holding that providing fewer programs at a smaller women's prison than at a larger men's prison did not violate equal

protection while noting that the difference between the prisons was "the obvious result of an undisputed fact: there are far fewer female inmates").

What Plaintiff's Complaint really seeks is an *unequal* application of the laws. Because there are currently no other death row inmates at DJRC, Plaintiff suggests that she should be allowed to interact with the general population. (D.E. 9, PageID# 119, 140, ¶¶ 51, 139.) In other words, Plaintiff wants TDOC to stop applying the mandatory segregation policy to all death row inmates evenly and instead treat female death row inmates differently than male death row inmates. The Equal Protection Clause does not require such an absurdity. Plaintiff has failed to adequately plead that Defendants have targeted a suspect class with disparate treatment. *See Ctr. for Bio-Ethical Reform, Inc.*, 648 F.3d at 379.

**B.     Plaintiff has not identified a similarly situated individual to support her class-of-one theory.**

A plaintiff may bring a "class of one" equal protection claim when she alleges (1) intentional differential treatment from others similarly situated (2) without a rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). Governmental action that does "not interfere with fundamental rights or single out suspect classifications must bear only a rational relationship to a legitimate state interest." *Richland Bookmart, Inc. v. Nichols*, 278 F.3d 570, 574 (6th Cir. 2002). "Class-of-one claims are generally viewed skeptically because such claims have the potential to turn into an exercise in which juries are second-guessing the legislative process." *Loesel v. City of Frankenmuth*, 692 F.3d 452, 461 (6th Cir. 2012). A plaintiff bears a "'heavy burden' to prevail based on the class-of-one theory." *Id.* at 462 (quoting *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 791 (6th Cir. 2005)). To carry this burden, a plaintiff must first identify someone "similarly situated in all material respects" from whom they were treated differently. *Id.*

Plaintiff has not taken this essential first step. Beyond vague allusions to nonspecific inmates, Plaintiff identifies, at most, three comparators. She compares herself to Nick Sutton, who she claims was treated better despite his murder of another inmate. (D.E. 9, PageID# 139, ¶ 135.) What Plaintiff does not allege, however, is whether Nick Sutton attempted to kill another inmate *while already on death row*[7] or attempted to escape from prison—both of which Plaintiff has done. Plaintiff has not—and cannot—allege that she and Nick Sutton are "similarly situated in all material respects." *Loesel*, 692 F.3d at 461. She also compares herself to Gaile Owens, who she claims was treated better as "the only other woman sentenced to death during [Plaintiff]'s incarceration." (D.E. 9, PageID# 118, ¶ 49-50.) But again, Plaintiff fails to allege how she and Gaile Owens are similarly situated in all material respects—she has only alleged that they share one thing in common. Their crimes alone are materially different. Plaintiff tortured her victim for thirty minutes to an hour, repeatedly slashing her throat while she begged for mercy before bludgeoning her with a chunk of asphalt and saving a piece of her shattered skull as a souvenir. *State v. Pike*, 978 S.W.2d at 908-12. Gaile Owens hired a hit-man to kill her husband. *State v. Porterfield*, 746 S.W.2d 441, 444 (Tenn. 1988). And Gaile Owens left death row over a decade ago when the Governor commuted her sentence—long before TDOC had adopted the current level system for all capital offenders. ("Commutation for Gaile Owens," Exhibit 10.) Finally, Plaintiff compares herself passingly to "other individuals incarcerated in [her] pod." (9, PageID# 26, ¶ 98.) But, of course, none of them are awaiting execution. (D.E. 9, PageID# 110, ¶ 17.)

The Complaint also lacks sufficient allegations to satisfy the second prong of the class-of-one test. "To survive a motion to dismiss in the rational basis context, a plaintiff must allege facts

---

[7] In fact, he did not. His attack of another inmate occurred while serving a life sentence. *State v. Sutton*, 761 S.W.2d 763, 767 n.2 (Tenn. 1988).

sufficient to overcome the presumption of rationality that applies to government classifications." *In re city of Detroit, Mich.*, 841 F.3d 684, 701 (6th Cir. 2016); *D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 686 (7th Cir. 2013) ("To get past a Rule 12(b)(6) motion to dismiss on a class of one equal protection claim, a plaintiff must allege facts sufficient to overcome the presumption of rationality that applies to government classifications.") (internal quotations omitted). A plaintiff can only overcome the presumption of rationality on a class-of-one theory "either by negativing every conceivable reason for the government's actions or by demonstrating that the actions were motivated by animus or ill-will." *Loesel*, 692 F.3d at 462. Plaintiff's failure to identify a similarly situated comparator is fatal to this prong. But the Complaint also fails to negative any of the many rational bases that could explain any differences in treatment; and the only allegation supporting a claim of animus is the conclusory allegation that Plaintiff's treatment is "the result of animus directed toward [her]." (D.E. 9, PageID# 145, ¶ 166.) Plaintiff has failed to specifically identify an individual that is similarly situated in all material respects who has been treated differently without a rational basis for the difference in treatment.

## III. Plaintiff Has No Liberty Interest in a Housing Assignment in General Population.

To establish a procedural due process claim, Plaintiff must first demonstrate the deprivation of a liberty interest. Here, Plaintiff has no liberty interest in a housing assignment with the general population. Therefore, her allegation that being placed in administrative segregation without a hearing violates due process fails.

The constitutional due process protection "has both a substantive and a procedural component." *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 855 (6th Cir. 2012). Under procedural due process, a government must "provide a 'fair procedure' when depriving someone of life, liberty, or property." *Id.* (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). To show a procedural due process violation, Plaintiff must demonstrate "that (1)

[she] had a life, liberty, or property interest protected by the Due Process Clause; (2) [she] was deprived of this protected interest; and (3) the state did not afford [her] adequate procedural rights prior to depriving [her] of the property interest." *Id.* (quoting *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022)).

To satisfy the first element of a procedural due process claim, a prisoner must establish the deprivation of a liberty interest. *Meachum v. Fano*, 427 U.S. 215, 223-24 (1976) ("The initial inquiry is whether [the challenged action] infringed or implicated a 'liberty' interest of [the prisoner] within the meaning of the Due Process Clause."). "Liberty interests include 'the right of the individual to contract, to engage in any of the common occupations of life . . . and generally to enjoy those privileges long recognized . . . as essential to the ordinary pursuit of happiness by free men.'" *Women's Med. Pro. Corp.*, 438 F.3d at 611 (quoting *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

But Plaintiff is not free and does not enjoy the same liberty interests as free citizens. "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum*, 427 U.S. at 224. "In general, an inmate does not have a liberty interest in a particular security classification or in freedom from segregation." *Miller v. Campbell*, 108 F. Supp. 2d 960, 963 (W.D. Tenn. 2000); *see Meachum*, 427 U.S. at 225 (holding that confinement in maximum security is "within the normal limits or range of custody which the conviction has authorized the State to impose"); *Dodson v. Rhodes*, No. 3:21-cv-00705, 2021 WL 501804, at *2 (M.D Tenn. Oct. 28, 2021) ("First, inmates do not have a liberty interest in freedom from segregation."). Though States

24

may sometimes create liberty interests, they are "generally limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

Thus, to state a procedural due process claim, Plaintiff must identify an atypical and significant hardship that, in comparison "'with what an inmate can expect from prison life generally . . . presents dramatic departures from the basic conditions and ordinary incidents of prison sentences.'" *Miller*, 108 F. Supp. 2d at 965 (quoting *Wilson v. Harper*, 949 F. Supp. 714, 721 (N.D. Iowa 1996))). Plaintiff alleges that she experiences an atypical and significant hardship because, as an inmate sentenced to death, she is subject to administrative segregation until her execution, which she claims has "adverse physical and psychological effects." (D.E. 9, PageID# 144, ¶ 157.) This allegation fails to state a claim for three reasons.

First, subjecting Plaintiff to administrative segregation does not, in itself, violate procedural due process. As the courts of this district have recognized repeatedly, "[c]onfinement in segregation 'is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.'" *Dodson*, 2021 WL 5015804, at *2 (quoting *Hewitt v. Helms*, 459 U.S. 460, 467-73 (1983)); *Perkins v. Washburn*, No. 3:19-cv-00959, 2020 WL 3972749, at *7 (M.D. Tenn. July 14, 2020); *Botello v. Tenn. Dep't of Corr.*, No. 3:18-cv-00549, 2018 WL 3586315, at *3 (M.D. Tenn. July 26, 2018); *Brown v. Westbrooks*, No. 3:17-cv-00686, 2017 WL 3868275, at *2 (M.D. Tenn. Sep. 5, 2017); *Chaffins v. Lindamood*, No. 1:17-cv-00061, 2017 WL 3130558, at *4 (M.D. Tenn. July 24, 2017). Plaintiff does not have a liberty interest in being housed in the general population. To adequately allege an "atypical and significant hardship," Plaintiff must show her conditions dramatically depart from the type of administrative segregation normally contemplated by a sentence to incarceration, and she has failed to meet that burden.

Second, as explained in detail in Parts I and II, *supra*, Plaintiff's conditions of confinement in administrative segregation are not cruel and do not vary from the treatment of other death row inmates. Plaintiff is not being deprived of any necessities and she enjoys privileges that get her out of her cell about eight hours per weekday. *See* Part I, *supra*. And she has not identified any similarly situated individual from whom she is treated differently. *See* Part II, *supra*. In other words, Plaintiff's administrative segregation is not "atypical"—it is exactly what is typical for all other death row inmates.

So, third, Plaintiff's procedural due process claim turns entirely on one question: does the Due Process Clause prohibit a State from administratively segregating all inmates under a sentence of death from general population inmates for the duration of their confinement before execution? The answer is no. As multiple federal circuit courts of appeal have recognized, administrative segregation does not pose an atypical and significant hardship for death row inmates because an inmate under a sentence of death can expect to be segregated from the general population for the length of their sentence until execution. *See Williams v. Secretary Pennsylvania Dep't of Corr.*, 848 F.3d 549, 561-62, 569 (3d Cir. 2017) (recognizing that "confinement on death row was not a significant or atypical hardship" for inmates under sentence of death); *Prieto v. Clarke*, 780 F.3d 245, 252-54 (4th Cir. 2015) (holding that inmate sentenced to death had no liberty interest in avoiding death row); *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984) (holding inmate sentenced to death had no liberty interest in remaining in the general population); *Parker v. Cook*, 642 F.2d 865, 874 n.7 (5th Cir. 1981) (noting that death row inmates have no expectation of being place in the general population and, therefore, no liberty interest exists); *see also Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008) (holding that indefinite administrative segregation may be an atypical and significant hardship *for non-capital inmates*). As an inmate sentenced to death

awaiting execution, Plaintiff has no liberty interest in avoiding segregation from the general population. Though she has no expectation of being housed in general population, she is still afforded life's necessities, including medical care, and additional privileges, including 38 hours per week outside of her cell. Plaintiff cannot be deprived of something she is not entitled to; her procedural due process claim is unsupported by allegations establishing even the first element.

## IV. Plaintiff Has Failed to Show that She Was Discriminated Against on the Basis of a Disability or that the Defendants Denied Her Any Reasonable Accommodation.

In Counts VII, VIII, and IX, Plaintiff alleges that the Defendants have "violated her rights" under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.* ("ADA") and the Rehabilitation Act, 29 U.S.C. § 794 ("Rehabilitation Act"), bringing the action under 42 U.S.C. § 1983. The Complaint does not contain sufficient factual allegations to state a claim upon which relief can be granted with respect to any of the three counts.

### A. Plaintiff cannot state a claim under Section 1983 by alleging violations of the ADA and Rehabilitation Act.

Plaintiff purports to bring her ADA and Rehabilitation Act claims under Section 1983. As multiple courts in this circuit and others have concluded, Section 1983 is an inappropriate vehicle for claims under the ADA and Rehabilitation Act. *See Lollar v. Baker,* 196 F.3d 603, 610 (5th Cir. 1999) (concluding that Congress intended to foreclose resort to § 1983 due to the specific comprehensive internal enforcement mechanism contained within the Rehabilitation Act); *Alsbrook v. City of Maumelle*, 184 F.3d 999, 1011 (8th Cir. 1999) (en banc) (applying the same reasoning to Title II of the ADA); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1531 (11th Cir. 1997) (holding a plaintiff could not "maintain a section 1983 action in lieu of – or in addition to – a Rehabilitation Act or ADA cause of action" against the state when the only alleged deprivation was of rights created by those acts); *Cole v. Taber*, 587 F.Supp.2d 856, 863 (W.D. Tenn. 2008); *Burnette v. University of Akron*, No. 05:11-CV-02361, 2012 WL 3587568, at *5 (N.D. Ohio

August 20, 2012); *Porter v. Ellis*, 117 F.Supp.2d 651, 652 (W.D.Mich.2000); *Westermeyer v. Ky. Dep't of Pub. Advocacy*, No. 2:10–131–DCR, 2011 WL 830342, at *7 n. 1 (E.D.Ky. Mar. 3, 2011); *see also Vinson v. Thomas*, 288 F.3d 1145, 1156 (9th Cir. 2002) (citing *Lollar*, *Alsbrook*, and *Holbrook* before joining in their conclusions).  Because Plaintiff cannot sustain a claim under § 1983 for violations of the ADA and Rehabilitation Act, Counts VII, VIII, and IX could be dismissed for that reason alone.

### B. Plaintiff's allegations fail to satisfy critical elements of both intentional discrimination and failure-to-accommodate claims under the ADA and Rehabilitation Act.

Both the ADA and the Rehabilitation Act proscribe discrimination against individuals with disabilities.  Title II of the ADA states that "no qualified individual with a disability shall, *by reason of such disability*, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (emphasis added).  Similarly, under the Rehabilitation Act of 1973, "No otherwise qualified individual with a disability in the United States, . . .  shall, *solely by reason of her or his disability*, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794 (emphasis added).  "It is well-established that the two statutes are quite similar in purpose and scope." *McPherson v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453 (6th Cir. 1997).

ADA and Rehabilitation Act claims have similar elements, with two caveats.  To establish a prima facie ADA claim, "'a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subject to discrimination under the program because of her disability.'" *Douglas v. Muzzin*, No. 21-2801, 2022 WL 3088240, at *5 (6th Cir. Aug. 3, 2022) (quoting *Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015)).  For a Rehabilitation Act claim, a plaintiff must show "'(1) that [she] is

disabled; (2) that [she] was otherwise qualified . . .; (3) that [she] was excluded solely by reason of [her] disability; (4) and that the relevant program is receiving federal financial assistance.'" *Id.* (quoting *Doe v. Salvation Army in U.S.*, 531 F.3d 355, 358 (6th Cir. 2008)). Thus, the first two elements of either an ADA or Rehabilitation Act claim are practically identical, but the causation standards differ. For ADA claims, a plaintiff must establish a "but-for" relationship between significant evidence of animus and discriminatory behavior. *Gohl v. Livonia Pub. Sch. Sch. Dist.*, 836 F.3d 672, 682 (6th Cir. 2016). For Rehabilitation Act claims, the standard is higher: the plaintiff must "show that the defendant's acts were done '*solely* by reason of' the disability." *Id.*; *also Bledsoe v. Tennessee Valley Auth. Bd. of Directors*, 42 F.4th 568, 580 (6th Cir. 2022) (noting the Sixth Circuit's previous holdings that "a 'but-for' causality standard applies to ADA claims and that a 'sole-cause' standard applies to Rehabilitation Act claims"). Failure to satisfy the ADA's "but-for" standard necessarily results in failure under the Rehabilitation Act's "sole cause" standard. *Gohl*, 836 F.3d at 682 (holding "[t]he distinction between the two requirements is of no moment" when the "but-for" standard is not satisfied). In Rehabilitation Act cases, a plaintiff also bears the additional burden of establishing that the entity receives federal funding. *Andrews*, 104 F.3d at 807.

While Plaintiff divides her claims into three Counts, she alleges intentional discrimination under the ADA in Count VII and under the Rehabilitation Act in Count IX, and failure to accommodate in violation of both the ADA in Count VIII and Rehabilitation Act in Count IX. At this stage in litigation, Defendants do not dispute that, taking the facts as plead, Plaintiff has alleged that she suffers from multiple disabilities. (D.E. 9, PageID# 149-50, 152, ¶¶ 186-93, 213-14). Further, Defendants do not dispute that Plaintiff has alleged that TDOC receives federal funding. (D.E. 9, PageID# 152, ¶ 212). Notwithstanding these facts, Plaintiff fails to allege a prima facie

case for intentional discrimination or failure to accommodate because every inmate under a capital sentence is subject to the same classification system and restrictions as Plaintiff. Plaintiff has made no factual allegations regarding specific ways in which her disabilities altered application of the same policies and classification levels to which other inmates are subject, and, as a consequence of this omission, Plaintiff fails to state a claim upon which relief can be granted.

### 1. Plaintiff Has Failed to Allege That Defendants Have Intentionally Discriminated Against Her on the Basis of Her Disability.

"A plaintiff alleging intentional discrimination—that is, alleging that their disabilities were actually considered by the [defendant] in formulating or implementing the challenged discriminatory conduct . . . must present evidence that animus against the protected group was a significant factor in the discriminatory conduct." *Douglas*, 2022 WL 3088240, at *5 (internal quotations and citations omitted). Here, Plaintiff's allegations do not show—under either the ADA's "but-for" standard or the Rehabilitation Act's "sole cause" standard—that animus by Defendants against disabled persons is the cause of Plaintiff's alleged injuries.

In her complaint, Plaintiff alleges that she has suffered denial of "access to group socialization, activities, programming, group therapy, and proper medical and mental health treatment *because of* her placement in mandatory segregation." (D.E. 9, PageID# 150, 153, ¶ 199, 216) (emphasis added). While she alleges that her denial of benefits results because of her placement in mandatory segregation, she does not then allege that this mandatory segregation results from her disability. Instead, Plaintiff alleges on at least ten separate occasions that her placement in mandatory segregation results *because of her sentence of death*, not because of her *disabilities*. (D.E. 9, PageID# 106, 112, 113, 115, 117, 119, 141, ¶¶ 2, 25n.2, 25n.3, 26, 38, 39, 44, 52, 53, 143). Indeed, there is no allegation that, but for Plaintiff's disability, she would no longer be subject to mandatory segregation. Plaintiff's allegations admit that her presence on death

row is owed entirely to her conviction for first degree murder. Accordingly, Plaintiff cannot state a claim for intentional discrimination under the ADA or Rehabilitation Act.

### 2. Plaintiff is Not Otherwise Qualified for Exemptions from the Mandatory Segregation Policy.

A failure-to-accommodate claim does not require a showing of animus; instead, a refusal to provide a reasonable accommodation can serve to establish disability discrimination. *Douglas*, 2022 WL 3088240, at *6. Both the ADA and the Rehabilitation Act require reasonable modifications to a program when necessary to avoid discrimination based on disability. *Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021) (ADA); *Alexander v. Choate*, 469 U.S. 287, 301 (1985) (Rehabilitation Act). But under both the ADA and the Rehabilitation Act, a plaintiff still must establish that she would be otherwise qualified for the program or benefit if not for her disability. *See Mootoor v. Eastern Kentucky University*, No. 20-6166, 2022 WL 782663, at *5 (6th Cir. Mar. 15, 2022); *Diemond v. Michigan Dep't of Corr.*, No. 18-1344, 2018 WL 7890769, at *2 (6th Cir. Oct. 31, 2018). Here, Plaintiff has failed to allege facts sufficient to support a failure-to-accommodate claim, because she is not "otherwise qualified" for the accommodation she seeks.

Plaintiff alleges that Defendants have failed to accommodate Plaintiff's disabilities by placing her in administrative segregation. (D.E. 9, PageID# 151-534 ¶¶ 206, 221.) Without specifying exactly what accommodations she requested that Defendants have denied, Plaintiff appears to claim that Defendants are required to grant her exemptions from mandatory segregation such that she can participate in the benefits of being housed in the general population. But Plaintiff is not "otherwise qualified" for housing in the general population or participation in any program other than mandatory segregation. Because of her death sentence, the only program Plaintiff is qualified for is mandatory segregation. (TDOC Pol. & Proc. 404.11(V), Exhibit 1, at 1; D.E. 9, PageID# 115, ¶ 38.) To put it another way, the ADA and the Rehabilitation Act do not require a

defendant to completely restructure a program or waive its eligibility requirements just because an applicant has a disability. *See Sandison v. Michigan High School Athletic Ass'n, Inc.*, 64 F.3d 1026, 1034-37 (6th Cir. 1995) (holding that requiring high schools to waive their under-nineteen age limit for participation in interscholastic sports was not a reasonable accommodation). The very nature of mandatory segregation rests on segregating death row inmates from the general population. *See Sandison*, 64 F.3d at 1034 (holding an "accommodation is not reasonable if it . . . requires a fundamental alteration in the nature of the program" (internal quotations omitted)). Plaintiff is excluded from the benefits she seeks by reason of her sentence, not by reason of her disability.

Plaintiff has failed to identify a reasonable accommodation to a program that she is otherwise qualified for which Defendants have refused. Her failure-to-accommodate claims should be dismissed.

## V. Plaintiff Fails to Identify a Sincerely Held Religious Belief That is Substantially Burdened.

Plaintiff has failed to state a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). RLUIPA prohibits Defendants from "impos[ing] a substantial burden on the religious exercise" of Plaintiff unless the burden "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1. To make out a prima facie case under RLUIPA, a plaintiff must show that an exercise of religion grounded in a sincerely held religious belief is *substantially* burdened. *Holt v. Hobbs*, 574 U.S. 352, 360-61 (2015); *Ackerman v. Washington*, 16 F.4th 170, 179 (6th Cir. 2021) (holding that "[t]he prisoner bears the initial burden" in showing (1) a sincerely held religious belief and (2) a substantial burden).

While the sincerity prong is often "not a difficult hurdle for prisoners," they are not "foreordained to win in every case." *Ackerman*, 16 F.4th at 180-81. Courts can assess the credibility and sincerity of a prisoner's stated belief. *Id*. At a minimum, a prisoner must identify a central religious belief or practice to satisfy the sincerity prong. *See Barhite v. Caruso*, 377 F. App'x 508, 511 (6th Cir. 2010) (holding that a failure to connect government action to a sincerely held religious belief "failed to satisfy the initial step needed to establish a RLUIPA claim"); *Allen v. Holt*, No. 3:18-cv-0033, 2018 WL 1640821, at *3 (M.D. Tenn. Apr. 5, 2018); *Grisham v. Pritcher*, No. 3:14-cv-02023, 2015 WL 367090, at *3 (M.D. Tenn. Jan. 27, 2015) ("[T]o state a *prima facie case* . . . a prisoner-plaintiff must simply allege facts showing that he has sincerely held religious beliefs and that a prison policy places a substantial burden on the plaintiff's ability to practice a fundamental or indispensable religious observation.").

Religious exercise is only substantially burdened when government action "force[s] an individual to choose between 'following precepts of [his] religion and forfeiting benefits' or when the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Hayes v. Tennessee*, 424 F. App'x 546, 555 (6th Cir. 2011) (quoting *Barhite*, 377 F. App'x at 511).

Plaintiff has failed to satisfy either prong necessary to state a RLUIPA claim. To support her claim, Plaintiff only alleges generally that she "has been denied visits from her spiritual adviser during her time in solitary confinement." (D.E. 9, PageID# 148, ¶ 181.) In another part of the complaint, she also admits that she "has access to a spiritual advisor" but complains that for some period her visits with her advisor "were moved to non-contact visits." (D.E. 9, PageID# 126, ¶ 79.) There are three glaring deficiencies in these allegations. First, Plaintiff does not identify any sincerely held central religious belief that requires that she meet with a spiritual advisor or dictates

how often those meetings must occur. She has not alleged what religion she follows, why in-person visits from a spiritual advisor are central to the religion, or how the alleged denial of visits at some point during her incarceration are currently burdening her religious exercise. Second, and consequently, she cannot identify a government action that substantially burdens her religious belief because there is none to burden. Without having alleged a sincerely held religious belief that is currently burdened, Plaintiff cannot identify any ongoing government action that is causing the burden and requires justification under RLUIPA. Third, Plaintiff's allegation that she "has been denied visits" in the past would not support her claim for injunctive relief today. RLUIPA only provides prospective injunctive relief against state prison officials, not a remedy for past wrongs. *Haight v. Thompson*, 763 F.3d 554, 568-70 (6th Cir. 2014). Plaintiff has provided no reference to when, in her quarter-century of confinement, the alleged RLUIPA violations occurred. Because of these deficiencies, Plaintiff has failed to state a claim that a current action or policy substantially burdens a sincerely held religious belief.

## VI.    Plaintiff Fails to State a Claim for Denial of Access to Courts or of Access to Counsel.

Plaintiff alleges that Defendants have denied her access to courts in contravention of the First and Fourteenth Amendments and violated her statutory right to counsel under 18 U.S.C. § 3599. Both counts fail to state a claim upon which relief can be granted.

Preliminarily, Plaintiff asserts that the basis for the denial of those rights stems from her being denied contact visits with attorneys. (D.E. 9, PageID# 146-148, ¶¶ 168-179.) Whether or not that was true before June 24, 2022, Plaintiff also acknowledges that, on that day, she was stepped down to Level A supervision. (D.E. 9, PageID# 107, ¶ 4; see also, TDOC Pol. & Proc. 503.03(VI)(K)(3)(c), Exhibit 3, at 5.) As previously mentioned, TDOC policy allows contact visits for Level A offenders; Plaintiff now may have contact visits with immediate family and *attorneys*. (Memorandum to Unit 3 Staff, Exhibit 9, at 2; D.E. 9, PageID# 125-126, ¶ 78.) No TDOC

employee is inside the room during those legal visits. (Memorandum to Unit 3 Staff, Exhibit 9, at 2.) Level A inmates are granted contact visits twice per week for a total of three hours or more, depending on space availability. (TDOC Pol. & Proc. 503.03(VI)(K)(3)(c), Exhibit 3, at 5.) Therefore, insomuch as the following legal arguments address the issues raised in the Plaintiff's complaint regarding non-contact visits, these arguments are now moot, by the Plaintiff's own admission. (D.E. 9, PageID# 107, ¶ 4); *see Green*, 474 U.S. at 73.

A. **Plaintiff's right of access to courts is fully protected by the representation of counsel.**

Plaintiff alleges that her right of access to the Courts was denied because her clemency counsel was denied contact visits with her. (D.E. 9, PageID# 146, ¶¶ 168-74.) The right of access to courts protects "the ability of an inmate to prepare a petition or complaint." *Wolff*, 418 U.S. at 576. To state a claim for violation of the right of access to courts, a prisoner "must plead and prove prejudice stemming from the asserted violation." *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996); *see also Sampson v. Garrett*, 917 F.3d 880, 881 (6th Cir. 2019) ("A successful access claim requires a prisoner to show that the defendants have scuttled his pursuit of a nonfrivolous, arguable claim."); *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996)*; Smith v. Corrections Corp. of Amer.*, 19 Fed. Appx. 318, 321 (6th Cir. 2001). Plaintiff cannot meet this basic pleading requirement for two reasons: (1) her right of access is fully protected by the representation of counsel and (2) Plaintiff has not identified any post-conviction or civil rights claim prejudiced by her alleged lack of access.

First, a plaintiff cannot plead a claim for lack of access at a time the inmate is represented by counsel: representation by counsel is sufficient to fully protect the right. *Martucci v. Johnson*, 944 F.2d 291, 295 (6th Cir. 1991) (holding access to courts claim was "without merit" when prisoner was represented by counsel during the length of his detention*); Nichols v. Parker*, No.

3:21-CV-00698, 2021 WL 5041291, at *6 (M.D. Tenn. Oct. 29, 2021). As a matter of law, a state fulfills its constitutional obligation to provide full access when an inmate is represented by counsel. *Holt v. Pitts*, 702 F.2d 639, 640 (6th Cir. 1983).

Plaintiff, as a matter of law, fails to state a claim for a violation of the right of access to courts because her complaint acknowledges that she is and has been represented by counsel. (D.E. 9, PageID# 107, ¶ 4.) Plaintiff's quibbles with the type and frequency of contact with her attorneys are insufficient to state a claim for denial of access to the courts. So long as Plaintiff was represented by counsel during the alleged time of denial, her right was fully protected. *Holt v. Pitts*, 702 F.2d 639, 640 (6th Cir. 1983).

Second, the right of access to courts "is not a generalized 'right to litigate.'" *Thaddeus-X v. Blatter*, 175 F.3d 378, 391 (6th Cir. 1999). The right "extends to direct appeals, habeas corpus applications, and civil rights claims only." *Id.*; *Vick v. Core Civic*, 329 F. Supp. 3d 426, 457 (M.D. Tenn. June 11, 2018) (holding that "an inmate must establish the prison official impeded his pursuit of a non-frivolous post-conviction or civil rights action, i.e., a denial or dismissal of a direct appeal, habeas petition, or civil rights case seeking to vindicate basic constitutional rights").

Plaintiff fails to identify a direct appeal, post-conviction proceeding, or civil rights claim that has been prejudiced by a lack of access to the courts. Indeed, Plaintiff was represented by appointed counsel specially qualified to handle capital cases in her direct appeal, state post-conviction proceedings, and federal habeas corpus litigation. 18 U.S.C.A. § 3599; *State v. Pike*, 978 S.W.2d 904 (Tenn. 1998); *Pike v. State*, No. E2009-00016-CCA-R3-PD, 2011 WL 1544207, at *69 (Tenn. Crim. App. Apr. 25, 2011); *Pike v. Gross*, 936 F.3d 372 (6th Cir. 2019). The only ongoing "litigation" identified by the complaint is Plaintiff's planned petition for clemency from the Governor. Clearly, the right to access *courts* does not include a request to the *Governor*. *See*

*Cunningham v. Dist. Attorney's Off. for Escambia Cnty.*, 592 F.3d 1237, 1272 (11th Cir. 2010). And, in any event, Plaintiff has the assistance of counsel in making her request to the Governor. (D.E. 9, PageID# 146-147, ¶¶ 170-171.)   The Amended Complaint is devoid of the bare minimum allegations necessary to plead a violation of the right of access to courts.

B.     **Section 3599 does not grant a right to particular types of contact with clemency counsel.**

Count V of the Complaint concludes that, when the Plaintiff was not allowed contact visits with her clemency counsel, her right of access to counsel was also denied. She notes that non-contact visits "makes it much more challenging to review documents. . . ." (D.E. 9, PageID# 148, ¶ 179.) However, Plaintiff has no right to contact visits and has been represented by counsel the pendency of her complete post-conviction and current clemency proceedings.

There is no constitutional right to counsel beyond the trial and direct appeal as of right in a criminal proceeding.  *Garza v. Idaho*, 139 S. Ct. 738, 749 (2019); *Murray v. Giarratano*, 492 U.S. 1, 7 (1989).   Nonetheless, Congress has authorized federal public defenders to represent capital defendants in federal habeas corpus litigation and subsequent state clemency applications. *Harbison v. Bell*, 556 U.S. 180, 183-88 (2009); 18 U.S.C. § 3599(a)(2).  Section 3599 provides counsel to an indigent federal habeas petitioner "seeking to vacate or set aside a death sentence," and counsel's representation continues through "every subsequent stage of available judicial proceedings, including . . . proceedings for executive or other clemency."  18 U.S.C. §§ 3599(a)(2), 3599(e).   However, by its plain terms, § 3599 does not provide a statutory right to contact visitation.  *See* 18 U.S.C. § 3599 (containing no reference to contact visitation or to visitation in general).   Indeed, some courts have recognized that while Section 3599 provides funding for certain activities related to clemency, it does not "confer[] jurisdiction on district courts to issue

orders to state prisons in furtherance of these state clemency applications." *Beaty v. Ryan*, 413 Fed. App'x 964, 965-66 (9th Cir. 2011).

Here, Plaintiff has not alleged that she does not have legal assistance, only that she was not granted contact legal visits each time that they were requested. (D.E. 9, PageID# 147-148, ¶ 175-179.) Section 3599 does not provide a right to contact legal visits. It certainly does not mandate that visitation with an attorney or experts be as easy as possible. Instead, it authorizes the expenditure of federal funds so that Plaintiff may enjoy court-appointed, qualified representation in her clemency application. There is no dispute that that she has that representation. (D.E. 9, PageID# 147-148, ¶ 175-179.) Because Section 3599 does not confer any authority on federal courts to micromanage state prisons, much less to order certain types of contact during visitations with counsel, the Amended Complaint fails to state a claim upon which relief can be granted.

## CONCLUSION

For the reasons stated, Plaintiff's complaint should be dismissed in its entirety with prejudice.

Respectfully Submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

/s/ *Dean S. Atyia*
DEAN S. ATYIA (BPR # 039683)
Team Leader
Assistant Attorney General
CODY N. BRANDON (BPR # 037504)
Assistant Attorney General
ANDREW MIZE (BPR # 037034)
Assistant Attorney General
Law Enforcement and
Special Prosecutions Division

Office of the Tennessee
Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 532-741-7982
Fax: (615) 532-4892
Dean.Atyia@ag.tn.gov
Cody.Brandon@ag.tn.gov
Andrew.Mize@ag.tn.gov

**CERTIFICATE OF SERVICE**

I hereby certify that a true and exact copy of the foregoing was filed and served by operation of the Court's electronic filing system on this the 20th day of September 2022, upon:

Angela Lee Bergman
Brian D. Roark
Hannah E. Webber
150 Third Avenue South
Suite 2800
Nashville, TN 37201

*/s/ Dean S. Atyia*
DEAN S. ATYIA