IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **CHRISTA PIKE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 3:22-cv-00537** |
| | ) | |
| **v.** | ) | **District Judge Crenshaw** |
| | ) | |
| **FRANK STRADA, JOE MOORHEAD, TAUREAN JAMES, TERRY BARLOW, ASHLEE WHEELER, and JACQUELINE WILSON, each in their Official capacities,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF CHRISTA PIKE'S REPLY IN SUPPORT OF**
**EMERGENCY MOTION TO ENFORCE SETTLEMENT AGREEMENT**

TDOC cannot botch the execution of Christa Pike and then point to the injuries it caused as the reason Defendants no longer must honor their Settlement Agreement with her. The Agreement guarantees Ms. Pike group meals, work, lobby time, religious services, and recreation. (Dkt. No. 151-1, Ex. A (the "Settlement Agreement") ¶ 27(c)(iii)–(vii).) Defendants do not and cannot deny that they have failed to provide these since at least October 9th. The breach is clear, uncontested, and causing daily harm. Contract law does not excuse non-performance when the breaching party's own conduct caused any impracticability. *See Jenkins Subway, Inc. v. Jones*, 990 S.W.2d 713, 724–25 (Tenn. Ct. App. 1998) (citation omitted). A self-inflicted obstacle is no excuse, and Ms. Pike's motion must be granted.

Defendants' response concedes the essential facts—that, in the infirmary, Ms. Pike "could not work, socialize with other inmates, or join any kind of group activity," (Resp. at 4–5); that she is "separat[ed] from other inmates," (*id.* at 2, 5); that the Agreement "says nothing about medical care"—that is, it contains no medical exception, (*id.* at 2); and that TDOC's own Chief Medical

Officer cannot say when she will leave the infirmary. (Dkt. No. 156-1, Ortiz Decl. ¶ 17.) They offer no evidence contradicting Ms. Pike's sworn testimony that she currently has "no meaningful human contact apart from limited staff and medical personnel, my spiritual advisor, and my legal team." (Dkt. No. 151-3, Pike Decl. ¶ 14; *see also id.* ¶ 15.) Defendants argue only that because the Parties did not foresee that TDOC would botch her execution so badly that Ms. Pike would return, gravely injured, to the infirmary "until further notice," the Agreement simply stops applying. (Resp. at 3–4; Dkt. No. 151-2, Bergman Decl. ¶¶ 3, 5.) That position is irreconcilable with the Agreement's plain terms, contract principles, constitutional principles, and basic humanity.

## I. DEFENDANTS ARE IN BREACH AND THE AGREEMENT CONTAINS NO MEDICAL EXCEPTION.

Defendants argue that the Parties "did not contemplate medical care at all," so applying the Agreement here would "impose contractual liabilities not expressly assumed[.]" (Resp. at 3–4 (citation omitted).) That gets it backwards. The Agreement says the Individualized Plan "shall remain in place," subject to one condition—"level changes due to any disciplinary convictions[.]" (Settlement Agreement ¶ 35.) It permits a housing change only to "comparable housing that allows compliance with the terms of the Individualized Plan." (*Id.* ¶ 27(c)(ii).) It grants a waiver of Policy 404.11 and related provisions of Policy 503.03 to whatever "extent necessary to effectuate" it. (*Id.* ¶ 31.) It forbids any waiver not signed in writing by Ms. Pike. (*Id.* ¶ 20.) Silence about medical housing does not create a medical-housing exception; it is Defendants who ask the Court to write in a term the Parties did not include.[1]

Defendants also note that the infirmary existed in 2024 and the Parties "could have drawn

---

[1] Nor can Defendants recast the Settlement Agreement as a matter of Ms. Pike's "desire for social interaction." (Resp. at 4.) Relief from twenty-eight years of unconstitutional isolation was the consideration for which Ms. Pike dismissed viable claims. (Settlement Agreement ¶¶ 3, 5, 6, 10; Pike Decl. ¶ 5.) Defendants' dismissiveness shows their disregard for the bargain they struck and the harm they caused.

up terms" about it. (Resp. at 3–4.) Exactly so. TDOC operates the infirmary, administers its medical care, and knew far better than Ms. Pike what it could accommodate if she needed to be moved there. Even if the botched execution were unforeseeable (though Ms. Pike warned of it in numerous legal fora), an inmate's stay in the infirmary is a common contingency Defendants must be prepared for. A party that contracts with "full knowledge" of the conditions it later invokes cannot claim either supervening or existing impracticability. *See APAC-Atl., Inc. v. State*, 2013 WL 5883697, at *14–15 (Tenn. Ct. App. Oct. 31, 2013); *Patterson v. Methodist Healthcare–Memphis Hosps*., 2010 WL 363314, at *7 (Tenn. Ct. App. Feb. 2, 2010) (no excuse where party "knew of or had reason to know of" the difficulties they claimed made performance impossible or impracticable). Defendants are in breach of the Agreement's plain terms, which must be enforced.

## II. DEFENDANTS CREATED THE OBSTACLE THEY CITE, AND THEY HAVE NOT SHOWN THAT COMPLIANCE IS IMPOSSIBLE OR IMPRACTICABLE.

Stripped to its essence, Defendants' position is that they so grievously injured Ms. Pike that compliance has become impracticable. But a party cannot be excused from performance by a condition of its own making. *Jenkins Subway*, 990 S.W.2d at 724–25 (*quoting United Brake Sys., Inc. v. Am. Env't Prot., Inc.*, 963 S.W.2d 749, 756–57 (Tenn. Ct. App. 1997)); *St. George Holdings, LLC v. Hutcherson*, 632 S.W.3d 515, 527 (Tenn. Ct. App. 2020) (cause must be "not attributable to the non-performing party" (citation omitted)); *see* Restatement (Second) of Contracts §§ 261, 266(1) (discharge available only where performance is made impracticable "without [the party's] fault"); *Patterson*, 2010 WL 363314, at *7 (applying Restatement §§ 261 and 266 under Tennessee law). The only obstacle TDOC identifies is the injury TDOC itself inflicted, which has left Ms. Pike isolated in the infirmary. TDOC's continued incompetence cannot excuse its ongoing breach.

Nor have Defendants shown any extreme or unreasonable difficulty in complying with the Agreement. *See Patterson*, 2010 WL 363314, at *7. Nowhere do they say that group meals, work,

lobby time, or recreation with other women are impossible—only that Ms. Pike's particular housing proposal is unsuitable to those obligations. (Resp. at 5–6, 9.) That TDOC *has not* afforded these rights does not mean it *cannot*.[2]

Defendants' near-exclusive focus on infirmary services misses the point.[3] Dr. Ortiz attests to the services being provided to Ms. Pike and that the infirmary offers the most immediate access to those services. (Ortiz Decl. ¶¶ 9–13.) No provider says she must be *alone*. Dr. Ortiz states the placement is "not . . . intended to isolate her from other individuals." (*Id.* ¶ 8.) The isolation, then, is not a medical judgment at all, but an administrative choice—the very choice the Agreement forbids. Whether deliberate or the byproduct of Defendants' inattention, her current conditions of confinement breach the Settlement Agreement.[4]

## III. THE REMAINING ARGUMENTS MISCONSTRUE THE RELIEF SOUGHT.

**TDOC's Constitutional Duty to Provide Medical Care.** Ms. Pike welcomes Defendants' acknowledgment of their constitutional duty to provide medical care (Resp. at 6–7), but that duty is a red herring as to the instant motion. Neither the Constitution nor Ms. Pike's providers require

---

[2] Nor is impracticability an excuse where the event was among "the probable contingencies which a [person] of ordinary prudence should have foreseen and provided for." *St. George*, 632 S.W.3d at 527 (citation omitted) (brackets in original); *see also APAC-Atl.*, 2013 WL 5883697, at *14–15; *Patterson*, 2010 WL 363314, at *7.

[3] Defendants' description of "round-the-clock care" also bears scrutiny. (Resp. at 3.) Their own evidence does not explain how discrete encounters, (Ortiz Decl. ¶¶ 14, 18) preclude Ms. Pike from sharing a meal, a lobby period, or a recreation session with another inmate—whether in the infirmary, alongside other infirmary patients, or under any other arrangement TDOC might devise. Moreover, Defendants rely on the fact that Ms. Pike can have visitation (Resp. at 4), which takes place in Unit III, but offer no explanation, medical or otherwise, for why she cannot spend other time during the day in Unit III even if she must be housed in the infirmary.

[4] Defendants' comparison to Ms. Pike's hospitalization fares no better. (Resp. at 4–5.) A week in an intensive care unit, much of it unconscious and on a ventilator, is not an open-ended placement "until further notice" in TDOC's own facility, where TDOC controls every aspect of her day. (Pike Decl. ¶ 11; Bergman Decl. ¶¶ 3, 5.) And her access to counsel and a spiritual advisor (Resp. at 4) is no answer for Defendants' breach; Ms. Pike had those same contacts throughout her twenty-eight years of solitary confinement, with devastating results. (Pike Decl. ¶¶ 5–6, 14.) Legal visitation does not satisfy a single term of the Individualized Plan.

isolation. Ms. Pike does not ask the Court to "force TDOC to choose between acceding to Pike's demands and obeying the Constitution" (*id.* at 7); TDOC can and must provide adequate medical care *and* honor its obligations in the Agreement.

**No Judicial Management of the Prison Is Necessary.** Defendants mischaracterize the motion as seeking Ms. Pike's transfer out of the infirmary. (Resp. at 2, 7–9.) Ms. Pike asked the Court to order Defendants to "restore the conditions of the Individualized Plan to the fullest extent consistent with her medical needs and personal safety." (Mot. at 9–10.) Ms. Pike offered a suggestion based on her knowledge and belief, but determining how to satisfy TDOC's obligations is not the Court's burden, or hers; it is Defendants'.[5]

For the same reason, Defendants' deference cases (Resp. at 7–9) do not apply. *Turner*, *Overton*, and their progeny address whether courts should impose constitutional limits on prison policy. Here, TDOC already exercised its authority by negotiating, in detail, exactly how Ms. Pike would interact with others. (Settlement Agreement ¶¶ 27, 31–32.) Judicial involvement is necessary here only because they have declined to honor those commitments.

Finally, Defendants' security argument is overstated. The image of "maximum-security inmates . . . roam[ing]" a "nursing home" (Resp. at 9) bears no relation to a disabled fifty-year-old woman who, by Defendants' own account, requires constant medical attention and "could not defend [her]self" if attacked. (Resp. at 8; Pike Decl. ¶¶ 18, 20.) As Defendants are well aware, Ms. Pike's maximum-security classification is one mandated by her sentence, not by any independent judgment of her actual risk. (Settlement Agreement ¶ 3.) Security, in other words, offers no justification for Defendants to shirk the commitments they negotiated. Ms. Pike asks

[5] Despite repeated efforts to engage in meaningful discussion about these options, Defendants refused and responded that conversations were "premature." (Bergman Decl. Ex. 1.) Their brief is the first time Defendants responded to her purported misunderstanding of the Pods within Unit III.

only that Defendants keep them.

**CONCLUSION**

Defendants do not contest the breach. They instead ask to be excused from it. The Court should grant the motion, order Defendants to cease Ms. Pike's isolation and restore the conditions of the Individualized Plan to the fullest extent consistent with her medical needs and personal safety, require Defendants to file a notice of compliance within seven days, and award Ms. Pike her reasonable attorneys' fees, costs, and expenses under Paragraph 36 of the Agreement.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Angela L. Bergman*
Brian D. Roark (BPR 020262)
Angela L. Bergman (BPR 031981)
Hannah E. Webber (BPR 036244)
BASS, BERRY & SIMS PLC
21 Platform Way South, Suite 3500
Nashville, TN 37203
Phone: (615) 742-7738
broark@bassberry.com
abergman@bassberry.com
hannah.webber@bassberry.com

*Counsel for Plaintiff Christa Pike*

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing was filed and served by operation of the Court's electronic filing system on November 6, 2026, upon:

John W. Ayers (BPR# 037494)
Cody N. Brandon (BPR #037504)
Donna L. Green (BPR #019513)
Samantha P. Morris (BPR #038178)
Office of the Tennessee Attorney General and Reporter
P.O. Box 20207
Nashville, Tennessee 37202-0207
Phone: (615) 741-1982
Fax: (615) 532-4892
will.ayers@ag.tn.gov
cody.brandon@ag.tn.gov
donna.green@ag.tn.gov
samantha.morris@ag.tn.gov

*/s/ Angela L. Bergman*